IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SEAN CARTER, | ) | CASE NO.  3:02CV524 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE PETER C. ECONOMUS |
| v. | ) | |
| | ) | |
| MARGARET BRADSHAW, WARDEN, | ) | <u>ORDER OF DISMISSAL</u> |
| | ) | |
| Respondent. | ) | |

This matter is before the Court upon Petitioner, Sean Carter's ("Carter") Motion for Competency Determination and to Stay Proceedings, (Dkt. #132)("Motion for Competency Determination").  After conducting an evidentiary hearing and reviewing several experts' reports, the Court finds Carter to be incompetent and therefore unable to litigate grounds for relief one, two, five, and six raised in the petition.  Accordingly, the Court **DISMISSES** the instant action **WITHOUT PREJUDICE**.  The Court prospectively tolls the statute of limitations set forth in 28 U.S.C. § 2244(d).

## I. PROCEDURAL BACKGROUND

Carter was convicted and sentenced to death in a Trumbull County Court of Common Pleas for the aggravated murder, aggravated robbery, and rape of Veader Prince.  After exhausting his state court appeals, he initiated the instant federal habeas corpus proceeding on March 19, 2002.  Also on that date, Carter filed a Suggestion of Incompetence.  (Dkt. #1).  Carter obtained permission to depose trial counsel on December 17, 2003.  (Dkt. #99).  After filing an initial petition and two amended petitions, Carter sought and received permission to obtain psychological and neurological experts to examine him.

He thereafter filed a third amended petition on October 3, 2005, (Dkt. #129), to which the Respondent filed an amended return of writ. (Dkt. #138).  In this petition, Carter asserted, *inter alia*, that his right to a fair trial was violated when he was removed from it because of his disruptive behavior.  He also contended that defense counsel did not pursue the competency issue diligently and that they failed to investigate and present adequate mitigating evidence during the penalty phase of trial.

Concurrent with the third amended petition, Carter filed a Motion for Competency Determination and to Stay Proceedings.  (Dkt. #132).  On November 29, 2005, the Court granted the Motion for Competency Determination, staying the proceedings pending a competency determination, and setting a competency hearing date for December 16, 2005.  (Dkt. #139).  After two continuances, the Court held a competency hearing on May 1, 2006.  (Dkt. #169-70).  It thereafter issued an Order granting the parties' joint

-2-

request for post-hearing briefing.  Additionally, it ordered Carter's counsel to arrange for the Respondent's experts to observe Carter's interaction with habeas counsel.  (Dkt #171).

Carter filed an Objection with the Court, asserting that permitting the State's experts to observe his interaction with counsel would violate the attorney-client privilege. (Dkt. #173).  After the Court denied the Objection, Carter filed a Motion for Certification of Appeal under 28 U.S.C. § 1292(b), asking the Court to stay the habeas proceeding and notifying the Court that it would seek a writ of mandamus if the Court were to deny the Motion.  (Dkt. #179).  The Court denied the Motion on February 1, 2007.  (Dkt. #184).

Carter sought mandamus relief in the Sixth Circuit Court of Appeals from the Court's Order on February 28, 2007.  (Dkt. #185).  After accepting briefs on this issue, the Sixth Circuit granted Carter mandamus relief on November 5, 2007.  (Dkt. #186).

Thereafter, Carter filed a Motion for Records, requesting that the Court permit him to procure from the Ohio Department of Rehabilitation and Correction his medical records produced since the May 1, 2006, evidentiary hearing.  (Dkt. #190).  The Court granted the motion, allowing both parties to review the records and submit supplemental briefs by September 5, 2008.

## II. EVIDENTIARY HEARING & POST-HEARING

As noted above, the Court held an evidentiary hearing regarding Carter's competency to proceed with his habeas litigation on May 1, 2006.  On that date, Carter called Dr. Robert Stinson to testify on his behalf.  Dr. Stinson first testified about Carter's

-3-

childhood and mental health history.  He stated that Carter's mother was diagnosed with schizophrenia prior to his birth.  Children's Services removed Carter from her custody at age two when he was discovered tied to a couch and suffering from malnutrition.

After being placed in foster care, Carter was adopted.  That adoption ended abruptly when Children's Services became aware of verbal and physical abuse in the home.  Carter thereafter was adopted by the Carter family.  He lived with them until age 16 when he was placed in the custody of the Department of Youth Services.  Records from as far back as age two indicate that Carter's intellectual functioning placed him in the mild mental retardation range.  By age six, one report indicated that Carter was schizoid-prone and at high risk of becoming detached from reality.

Based on these records and his examinations of Carter, Dr. Stinson diagnosed Carter with schizophrenia, undifferentiated type, continuous course with prominent negative symptoms, as well as depressive disorder not specified, a personality disorder, and substance dependence that is in remission.  He stated that Carter experiences hallucinations that lead to problems in perception.  The schizophrenia also distorts his inferential thinking.  Dr. Stinson concluded that deficits in Carter's behavioral monitoring manifests in poor physical hygiene, spontaneous laughter, and unpredictable agitation.

Most significantly, Dr. Stinson observed, were the disease's affect on his language and communication abilities.  When speaking to Carter, Dr. Stinson observed that, "[Carter] lacks spontaneity, lacks elaboration.  His discussion is void of detail.  He doesn't engage in dialogue and provides a lot of empty responses."  (Dkt. #172, at 17).

-4-

Dr. Stinson opined that Carter does not have a factual understanding of the proceedings.  For example, Dr. Stinson testified, Carter held the false belief that he could not be executed unless he volunteered.  Additionally, when Dr. Stinson asked Carter to supply him with the name of one of his habeas attorneys, Carter responded with the name of one of his trial attorneys and Dr. Phillip Resnick, the examining psychiatrist for the State.  His prognosis for Carter's return to lucidity was poor.  Upon observing that, even with powerful anti-psychotic medication Carter still experienced several symptoms of schizophrenia, Dr. Stinson concluded that Carter likely will continue to experience severe symptoms of schizophrenia unless and/or until a new medication arrives that could more aggressively arrest his disease.  Id. at 30.

On cross-examination, the Respondent first queried on what standard Dr. Stinson based his opinion.  Dr. Stinson replied that he used the standard set forth in Rohan v. Woodford, 334 F.3d 803 (9th Cir. 2003), when assessing whether Carter understood the nature of the proceedings against him.  Specifically, he questioned whether Carter knew he had been sentenced to death, whether he understood he could be executed, whether he understood the appeals process, and whether he knew who his attorneys were and what their goals were.  (Dkt. #172, at 45).

The Respondent also questioned Dr. Stinson about Carter's belief that he could not be executed without volunteering.  She queried whether this false belief derived from Carter's being housed near a death-row inmate who previously had waived all further appeals and was thereafter executed.  After explaining that this was Carter's only contact

-5-

with a fellow inmate who was executed, she questioned whether Carter's belief was rational and based on observances he made.

Dr. Stinson replied that Carter's inability to comprehend that he could be executed was referred to in psychological terms as a "fixed false belief," i.e., an inaccurate perception that does not change even after attempts to educate the individual to the contrary.  (Dkt. #172, at 74).  Consequently, Dr. Stinson determined, Carter would continue to internalize the belief that he could not be executed without volunteering regardless of how many occasions others attempted to dissuade him from this belief.  Dr. Stinson concluded that, based in part on this false belief, Carter does not truly understand the adversarial nature of the proceedings.  Id. at 89.  Although Dr. Stinson conceded on cross-examination that Carter could communicate with his attorneys, he concluded that the severity of his schizophrenia renders him an "unreliable historian," requiring collateral records to corroborate his responses.  Id. at 98.

Carter next called Dr. Michael M. Gelbort, a clinical neuropsychologist, to testify. After examining Carter, Dr. Gelbort stated that Carter's thinking skills are fragmented and distracted, primarily due to his distraction from to internal stimuli.  He noted that in instances other than receiving straightforward, concrete information, Carter would have trouble responding.  Dr. Gelbort opined that Carter's capacity to learn new information and retain it was poor.  When asked whether Carter could assist his attorney, Dr. Gelbort responded as follows:

> Will he be able to provide anything other than a seemingly basic

-6-

assistance, to be able to consider what you present to him if it's other than very basic questions? While he may do so in many ways, it's not worth a whole lot of time or effort on his attorneys' part because his cognitive capabilities are so limited based on the test results, that what he will produce or give back to you is going to be of limited benefit. . . .

I know from my experience trying to elicit history, he is judged to be a very, very poor historian. Not that he's unwilling, but just simply to ask him questions does not elicit information from him that if he does know, he will recognize as being important or significant or relevant. And there are many times when, because of his poor memory, he doesn't have that information available to him at all, even though you would think that he would.

(Dkt. #172, at 112-13).

The State called the final witness of the hearing, psychiatrist Dr. Phillip Resnick. Dr. Resnick diagnosed Carter with chronic undifferentiated schizophrenia, substance abuse, and a personality disorder. He noted that at the time he evaluated Carter, he did not appear to be suffering from any delusions. Dr. Resnick assessed Carter's mental prognosis as fair to poor.

During the course of his evaluation, Dr. Resnick testified that Carter was able to converse with him about the specific charges of which he was convicted, the victim, his adopted grandmother, and that he was sentenced to death. Additionally, Carter relayed to

Dr. Resnick that if his appeals were not successful, he would receive a lethal injection. (Dkt. #172, at 145).  Although Dr. Resnick initially had reservations about whether Carter actually understood that he could be executed without volunteering, he allayed these concerns upon speaking to a social worker who confirmed that, after repeatedly attempting to educate Carter that he could be executed without volunteering, he had retained that information.  Accordingly, Dr. Resnick satisfied himself that Carter no longer possessed this false belief.

When the Respondent questioned Dr. Resnick about his ability to assist habeas counsel, he responded that Carter could respond to his attorneys but, "due to his illness, [could] not elaborate fully." Id. at 152.  He described Carter's condition as follows:

> So if asked a question, he would give kind of a simple answer, a direct answer.  You ask him how many sisters he has.  He can give you an answer.  But if you ask, would you describe each sister and explain what her personality is like, he would give a simple answer like she's nice, and would not be able to elaborate.
>
> So in my view, he meets the minimum standard because he can speak rationally and convey information.  But I would defer to the Court as to what is sufficient with respect to elaboration.

(Dkt. #172, at 152).  When questioned about Carter's ability to reliably convey relevant information, Dr. Resnick replied, "I think he can convey the basic information, but if you're asking for rich details in his recollection of the trial or his description of family

-8-

members, his illness does not permit him to give a rich description." Id. at 156.  Dr.
Resnick concluded that while Carter's disease is chronic, it currently was not in an acute
phase.

Attached to his supplemental brief submitted to the Court on June 23, 2008, is Dr.
Stinson's updated report regarding Carter's mental condition.  Dr. Stinson opined that
Carter's mental condition has deteriorated since the evidentiary hearing approximately
two and a half years ago.  He observed that from November 29, 2007, until December 20,
2007, Carter was transferred to Oakwood Correctional Facility, a psychiatric prison
facility, because of his declining mental condition.

Upon reviewing the notes from Oakwood, Dr. Stinson observed that Carter
continues to experience hallucinations.  Moreover, he has been disoriented and unable to
comprehend or respond to communications from others.  His daily functioning, while
previously restricted, also has deteriorated with extremely poor personal hygiene and lack
of consistent sleep habits due to nightly, persistent screaming and laughing.  From these
records, Dr. Stinson concluded that Carter's condition has become "progressively worse,
and despite treatment, he appears to have significant psychosis and functional limitations
even when he is at his expected baseline."  (Dkt. #194-2, Exh. A, at 20).

### III. STANDARD OF REVIEW

In its November 29, 2005 Order granting Carter's request for an evidentiary
hearing, the Court adopted the reasoning in Rohan v. Woodford, 334 F.3d 803 (9th Cir.
2003), in concluding that a petitioner has the right to be competent during federal habeas

proceedings.  (Dkt. # 139, at 12).  The Court now reviews the <u>Rohan</u> reasoning and holdings as well as subsequent cases in which courts were presented with this issue.  As is discussed below, the Court concludes that, while <u>Rohan</u> does not supply the Court with binding precedent, it remains the standard by which the Court should review Carter's competence.

## A. <u>Rohan v. Woodford</u>

In <u>Rohan</u>, the Ninth Circuit determined whether a petitioner possessed the right to be competent during federal habeas proceedings by conducting a review of decisional law supporting the right to competence after a criminal trial.  In that case, the district court appointed a "next friend" to file a petition on the petitioner's behalf when he appeared to be unable to do so.  The petitioner's "next friend" notified the district court that she was unable to proceed without the benefit of obtaining information from the petitioner.  Although the district court found that the petitioner's mental condition would "impede his attorneys from protecting his rights," <u>Rohan</u>, 334 F.3d at 806, it nevertheless held that the habeas litigation could continue because a petitioner had no right to be competent during habeas proceedings.

The Ninth Circuit disagreed.  It noted that in <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986), Justice Powell set forth the standard by which courts could determine whether an insane individual was competent to be executed.  He concluded that executions should be barred for individuals who were "unaware of the punishment they are about to suffer and why they are to suffer it."  <u>Id.</u> at 422.  While Justice Powell's separate opinion in <u>Ford</u> was

-10-

non-binding dicta, courts subsequently adopted it as the standard.  Rohan, 334 F.3d at 809-10).

The Rohan Court also noted the Supreme Court's holding in Rees v. Peyton, 384 U.S. 312 (1966), in which the Supreme Court ordered a competency determination when a petitioner sought to withdraw his habeas appeals.  Thus, while the Rohan Court observed that the Supreme Court had never adjudicated on the specific issue of whether a habeas petitioner has the right to be competent during habeas proceedings, it had recognized the right of individuals to be competent even after criminal trials.

The Rohan Court next observed the statutory limitations imposed on a petitioner who attempts to file a second habeas petition.  It concluded that if a petitioner were not competent to convey relevant information when presenting the first habeas petition, he or she would face substantial obstacles in presenting new claims in a second petition based on information a habeas petitioner might later be able to convey upon becoming competent.  Finally, the Rohan Court noted Congress's recognition of federal habeas as an important part of a defendant's appeal process by creating a statutory right to counsel during those proceedings.  Id. at 813 (citing 21 U.S.C. § 848(q)(4)(B), superceded by 18 U.S.C. § 3599(a)(2)).  It held that, implicit in the statutory right to meaningful counsel was a habeas petitioner's right to communicate with counsel.  It reasoned that, "if meaningful assistance of counsel is essential to the fair administration of the death penalty and capacity for rational communication is essential to meaningful assistance of counsel, it follows that Congress's mandate cannot be faithfully enforced unless courts ensure that a

-11-

petitioner is competent."  Rohan, 334 F.3d at 813.  Upon finding that a petitioner possesses the right to be competent during federal habeas proceedings, the Rohan Court next adopted the competency standard by which habeas courts should review these claims, i.e., whether a petitioner understands his or her position and whether the petitioner can assist habeas counsel.  Id. at 819.

The Ninth Circuit focused closely on this second prong of the competency test.  It observed that certain claims the petitioner raised in the case required the petitioner to provide counsel with information that he alone possessed.  For example, one claim the petitioner raised was that he was incompetent to stand trial.  The Ninth Circuit recognized that vital information from the petitioner was necessary to pursue this claim.  It opined, "[the petitioner's] own testimony about his former state of incompetence, for example, would (to the extent credited by the court) support his position.  He could also direct counsel to circumstantial evidence of his incompetence at the time."  Id. at 818.

The Rohan Court cautioned that habeas courts should not require habeas counsel to state with specificity what information they might require to bolster their claims.  It held, "Requiring an incompetent petitioner's counsel to identify precisely what the petitioner would tell him were he able seems more likely to elicit the response, 'Well, if I knew that, I wouldn't have to ask!'"  Id. at 818.  Accordingly, habeas counsel need only identify specific claims that require a petitioner's personal knowledge for full development.

Finally, not every instance of a habeas petitioner's incompetence would require a halt in the habeas proceedings.  The Rohan Court recognized that a petitioner's

incompetence may not hinder counsel from presenting a petition that includes claims based solely on evidence contained in the habeas record.  Id. at 816.  Because the Rohan petitioner had raised claims requiring the petitioner's personal knowledge, however, the Court stayed the habeas proceedings and remanded for the district court to hold a new competency hearing, if necessary.  Id. at 819.

### B. Post-Rohan Decisions

Since the Rohan decision, no court has reached the issue of whether a petitioner must be competent to litigate in habeas proceedings.  Instead, courts have held, on disparate grounds, that the particular circumstances presented in the case did not require the court to adjudicate on the issue.  In several circuit opinions, for example, the courts have presumed, without deciding, that the Rohan standard applies.  In those opinions, the courts have found that the petitioner failed to set forth sufficient evidence to support a finding of incompetence.  See Clayton v. Roper, 515 F.3d 784, 790 (8th Cir. 2008)(assuming without deciding that Rohan standard applicable but finding petitioner failed to demonstrate incompetence); Holmes v. Buss, 506 F.3d 576, 583 (7th Cir. 2007)(assuming without deciding Rohan's applicability when state declined to challenge it); Mines v. Dretke, 118 Fed. Appx. 806, 813 (5th Cir. 2004)(finding petitioner set forth insufficient evidence to support showing of incompetence regardless of whether Rohan correctly decided).

Most recently, a district court reviewing the competency issue found that, unlike in the Rohan decision, many of the petitioner's claims were based on evidence contained

-13-

within the habeas record.  Gonzalez v. Schriro, No. 99-2015-PHX-SMM, 2008 WL 1836743 (D. Ariz. Apr. 23, 2008).  The Gonzalez court then determined that the claims that could conceivably require the petitioner's assistance were unexhausted and therefore unripe for habeas review.  Id. at *11.  Consequently, the Gonzalez court never reached the competency issue.

Based on the above review, it appears that no court has rejected the Rohan holding outrightly.  While the Sixth Circuit has yet to decide the competency issue, it has determined, albeit in an unpublished opinion, that a petitioner must be competent to waive habeas appeals and submit to execution.  In Awkal v. Mitchell, 174 Fed. Appx. 248 (6th Cir. Mar. 8, 2006), the Sixth Circuit held that a habeas court must determine whether a capital habeas petitioner who wished to forego further appeals was competent to do so.

Applying the Supreme Court's holding in Rees v. Peyton, 384 F.3d 312 (1966), the Awkal Court remanded the case to the district court for a determination on whether the petitioner had "'the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.'" Awkal, 174 Fed. Appx. at 249 (quoting Rees, 384 U.S. at 314).  Thus, while the Sixth Circuit has not specifically held that a petitioner has the right to be competent to proceed with his or her habeas litigation, it has found the right to be competent when a habeas petitioner chooses not to proceed.

Finally, as the Seventh Circuit has observed, the Rohan holding does not have far-

-14-

reaching consequences.  In <u>Holmes v. Buss</u>, 506 F.3d 576 (7th Cir. 2007), the Court observed that the <u>Rohan</u> holding would not benefit non-capital habeas petitioners because it would only serve to delay the adjudication of their habeas claims indefinitely.  <u>Id.</u> at 578.  It noted that it could find no non-capital cases where a competency claim had been raised.

Because the <u>Rohan</u> holding remains intact and, if <u>Awkal</u> is any indication, may actually be adopted by the Sixth Circuit, the Court sees no reason to depart from its earlier conclusion that the <u>Rohan</u> holding is the standard of review here.  Accordingly, the Court will subject Carter's claims of incompetence to the <u>Rohan</u> test.

## IV. <u>ROHAN</u> ANALYSIS

### A. Preliminary Issues

Prior to determining whether Carter is competent pursuant to the <u>Rohan</u> test, the Court first must ascertain whether any claims raised in the petition require Carter's assistance to develop.  Upon identifying any such claims, the Court then must determine whether these claims are exhausted and ripe for federal habeas review.

The <u>Rohan</u> Court identified certain types of claims that can benefit from a petitioner's assistance.  It observed that the petitioner raised issues of his incompetence during trial and that trial counsel were ineffective for failing to pursue a competency hearing.  The Court reasoned that claims based on off-the-record communications between the defendant and counsel, such as ineffective assistance of counsel claims, were also subject to development by the petitioner's personal recollections.  <u>Rohan</u>, 334 F.3d 803,

818 (9th Cir. 2003).

A review of the amended petition reveals that of Carter's nine grounds for relief, grounds one (incompetence to stand trial and removal from the trial proceedings); two (ineffective assistance of counsel during mitigation); five (ineffective assistance of counsel for failure to pursue competency issue); and six (ineffective assistance of appellate counsel for failure to raise trial counsel's failure to pursue competency issue) potentially could benefit from Carter's assistance.[1] As Carter asserts in his post-hearing memoranda, he alone is in the position to inform habeas counsel what he actually observed during trial and his recollection of communications with defense counsel regarding his family and social background to develop mitigating evidence.

The Court next must determine whether these claims are exhausted and therefore ripe for federal habeas review. In the amended return of writ, the Respondent does not assert that any of the claims enumerated above are unexhausted. Accordingly, this Court cannot dismiss the competency issue, as did the Gonzalez court, on the grounds that no unexhausted issue requiring the petitioner's assistance is properly before it.[2]

---

[1] Although Carter also asserted in the eighth ground for relief that he is mentally retarded and therefore ineligible for execution, those types of claims, while typically requiring mental evaluations, do not require a habeas petitioner's lucid assistance for development. See, e.g., Stallings v. Bradshaw, No. 5:05-CV-722, slip op. at 90-94 (N.D. Ohio Mar. 31, 2008) (adjudicating Atkins claim based on experts' testimony in state court evidentiary hearing).

[2] While the Respondent asserts that some of the issues listed above are partially procedurally defaulted, that issue does not alter the Court's findings. First, because Carter has not submitted an amended traverse, the

-16-

## B. Competency Determination

Having determined that Carter raises claims that both require his assistance and are ripe for federal habeas review, the Court must now determine whether Carter currently is competent to litigate those claims as set forth in <u>Rohan</u>.  Thus, the Court must determine whether Carter comprehends his current position and whether he is able to assist his attorneys in litigating claims raised in the petition.  For the following reasons, the Court finds that Carter is not competent.

The question of whether Carter understands his current position is a close one.  At the evidentiary hearing, counsel for both parties questioned the experts extensively on the issue.  Both Carter's and the State's experts testified at the hearing that Carter suffers from schizophrenia that impairs his thought processes.  (Dkt. #172 at 15;142).  One specific example of this impairment that both parties explored was Carter's ability to understand whether he could be executed without volunteering.  As noted above, Dr. Stinson opined that Carter's "fixed false belief" that he could not be executed without volunteering would persist.  Consequently, he concluded that Carter does not truly understand the adversarial nature of the proceedings.  (Dkt. #172, at 89).

Conversely, Dr. Resnick testified that Carter was able to speak with him about the

---

Court has no means to determine whether Carter can avail himself to an excuse for failing to comply with the State's procedural rules, <u>i.e.</u>, whether he can establish cause and prejudice to excuse any procedural default. Moreover, because the Respondent concedes that some of the claims listed above were properly preserved for this Court's review, the potentially defaulted status of others is of no consequence.

specific charges of which he was convicted, the victim, and that he was sentenced to death.  Additionally, Carter relayed to Dr. Resnick that if his appeals were not successful, he would receive a lethal injection.  (Dkt. #172, at 145).  Although Dr. Resnick initially had reservations about whether Carter actually understood that he could be executed without volunteering, he allayed these concerns upon speaking to a social worker who confirmed that, after repeatedly attempting to educate Carter that he could be executed without volunteering, he had retained that information.  Accordingly, Dr. Resnick satisfied himself that Carter no longer possessed this false belief.

Because of the opposing opinions of the experts, the Court finds the question of whether Carter understands his current position is debatable.  If the Court were pressed to issue its opinion based solely on the evidentiary hearing testimony, it would be a difficult decision.  Because the Court has before it the updated records indicating that Carter's mental status has deteriorated since the hearing, the Court is inclined to credit Dr. Stinson's conclusion that Carter's mental illness prevents him from truly comprehending the nature of the habeas proceedings.

The Court's decision to find that Carter cannot assist habeas counsel is more clear-cut.  Each mental health expert that testified during the hearing found that Carter's illness diminished his ability to communicate with counsel.  Dr. Stinson concluded that the severity of Carter's schizophrenia renders him an "unreliable historian," requiring collateral records to corroborate his responses.  Id. at 98.  Echoing Dr. Stinson's findings, Dr. Gelbort noted that Carter was not uncooperative but that, "simply to ask him questions

-18-

does not elicit information from him that if he does know, he will recognize as being important or significant or relevant." (Dkt. #172, at 113).

Even the State's expert, Dr. Resnick, conceded that, because of the schizophrenia, Carter does not have the ability to "elaborate." Id. at 152. Dr. Resnick concluded that Carter could be of little assistance in providing information to habeas counsel. While he could provide basic information, Carter could provide no detail. As noted above, Dr. Resnick provided an example of his findings:

So if asked a question, he would give kind of a simple answer, a direct answer. You ask him how many sisters he has. He can give you an answer. But if you ask, would you describe each sister and explain what her personality is like, he would give a simple answer like she's nice, and would not be able to elaborate.

So in my view, he meets the minimum standard because he can speak rationally and convey information. But I would defer to the Court as to what is sufficient with respect to elaboration.

(Dkt. #172, at 152). While Dr. Resnick found Carter could respond to questions, he acknowledged that Carter's mental disease prevented him from providing counsel with detailed responses.

Significantly, Dr. Resnick conceded during the hearing that Carter could not provide habeas counsel with specific information regarding what occurred during trial or provide habeas counsel with details regarding potential mitigating information to develop

-19-

an ineffective assistance of counsel for failing to present mitigating evidence claim.  When questioned about Carter's ability to reliably convey relevant information, Dr. Resnick replied, "I think he can covey the basic information, but if you're asking for rich details in his recollection of the trial or his description of family members, his illness does not permit him to give a rich description."  Id. at 156.

Carter clearly cannot assist habeas counsel in developing the removal from trial, competency, and ineffective assistance of counsel claims raised in the petition.  As is apparent from the experts' testimony, Carter could not reasonably be expected to recall and describe how well he was able to view the trial once he was removed from it. Moreover, he would be unable to elaborate on conversations he had with defense counsel regarding his competency.  He also does not have the present capability to judge and express to habeas counsel what mitigating evidence from his social and family background defense counsel should have introduced during the sentencing phase of trial because of his limited capacity to recall and convey the details about any such events. Accordingly, the Court finds that Carter is incompetent to proceed with this federal habeas litigation.

While the Court believes the hearing testimony and subsequent medical records regarding Carter dictate this result, it observes that its finding does not invite a flood-gate of habeas petitioners asserting similar claims of incompetence.  As the Seventh Circuit noted in Holmes v. Buss, 506 F.3d 576, 578 (7th Cir. 2007), the Rohan holding would not benefit non-capital habeas petitioners because it would only serve to delay the

adjudication of their habeas claims.  Additionally, the requirement that capital habeas petitioners must demonstrate that the claims raised in the petition are properly exhausted and based on evidence outside the record that require the petitioner's assistance to develop would further hinder the filing of these claims.  Because of the strict statutory limitations on filing successive habeas petitions, moreover, habeas petitioners seeking to assert their incompetence likely must raise any competency issues in their initial petition.  Finally, to obtain a stay in their federal habeas proceedings, future habeas petitioners will have to demonstrate, as Carter does here, that they are incompetent pursuant to the Rohan test.  These multiple hurdles are unsurmountable for the vast majority of habeas petitioners.

## V. DISPOSITION

Having decided that Carter is incompetent to litigate his federal habeas claims, the Court now must determine the best course to proceed.  One option would be to stay this matter until Carter regains competency.  Federal habeas courts clearly have the inherent power to stay cases and hold them in abeyance.  Int'l Bhd. Of Elec. Workers v. AT & T Network Sys., 879 F.2d 864 (Table), at *8 (6th Cir. July 17, 1989)(citing Landis v. N. Am. Co., 299 U.S. 248, 255 (1936)).  In Rhines v. Weber, – U.S. – , 125 S.Ct. 1528 (2005), the United States Supreme Court held that the better course for a habeas court to choose when confronted with a "mixed" petition of exhausted and unexhausted claims is to stay the case, rather than dismiss it, and permit the petitioner to return to state court.  Id. at 1535.

The Sixth Circuit also has stayed a capital habeas corpus case so that the petitioner

could return to state court to determine whether he is mentally retarded under the holding

in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).  <u>Hill v. Anderson</u>, 300 F.3d 679 (6th Cir.

2002).  In that case, the Court found that, because the state of Ohio had not conceded that

the petitioner was mentally retarded, a factual dispute existed with respect to the

petitioner's ability to rely upon <u>Atkins</u> in his effort to avoid the death penalty.  The Sixth

Circuit held that "Ohio should have the opportunity to develop its own procedures for

determining whether a particular claimant is retarded and ineligible for death."  <u>Id.</u> at 682.

While the <u>Hill</u> decision to hold the case in abeyance provides this Court with some

guidance as to what options a federal habeas court may utilize when faced with an

incompetent petitioner, it is by no means dispositive of this issue.  In fact, because it deals

only with exhaustion rather than incompetency, the <u>Hill</u> Court is silent regarding any

consideration of the length of time an action might remain pending on the district court's

docket if a habeas petitioner cannot be restored to competency.

While the Sixth Circuit suggested one course of action in <u>Hill</u>, it has approved

alternative approaches as well.  In <u>Hargrove v. Brigano</u>, 300 F.3d 717 (6th Cir. 2002), the

Sixth Circuit affirmed a district court's decision to dismiss a mixed petition accompanied

by an order prospectively tolling the statute of limitations under 28 U.S.C. § 2244(d).

In that case, the Sixth Circuit held that the district court's decision to prospectively

toll the statute of limitations was reasonable, particularly in light of the fact that the court's

decision to equitably toll the statute of limitations was premised on the petitioner's

expeditious filing in state court and anticipated timely return to federal court.  <u>Id.</u> at 720.

Thus, the Hargrove Court has provided district courts another option to prevent habeas petitioners from incurring prejudice in their attempts to exhaust state remedies.  Since the Hargrove decision, courts have recognized the use of prospective equitably tolling of the statute of limitations to safeguard a petitioner's federal habeas claims.  See Griffin v. Rogers, 399 F.3d 626, 635 (6th Cir. 2005)(observing that the Hargrove holding "permits a re-filing [of a habeas petition] that would have been available had the case been conditionally stayed rather than dismissed."); Smith v. Bell, No. 07-CV-10749, 2008 WL 251890 (E.D. Mich. Jan. 29, 2008)(prospectively tolling § 2244(d) to permit habeas petitioner to exhaust claims in state court).

The Sixth Circuit also has determined that once exhaustion has occurred, any petition filed thereafter cannot be deemed a second or successive petition under 28 U.S.C. § 2244(b).  In Carlson v. Pitcher, 137 F.3d 416 (6th Cir. 1998), the Sixth Circuit held that a petitioner whose federal habeas petition initially was dismissed without prejudice to exhaust state remedies can return to federal court after state exhaustion without fear that the second federal habeas petition will be construed as a successive one.  Noting that all other circuits deciding this issue have held similarly, the Court found that, if the district court dismisses solely for exhaustion purposes, then no federal court has rendered a decision on the merits.  Id. at 419.  Consequently, the Sixth Circuit adopted the findings of other circuit courts, holding that the second petition is not a successive one, but rather "[i]t is one challenge with multiple stages . . . ."  Id. (quoting Benton v. Washington, 106 F.3d 162, 164 (7th Cir. 1996)).

While the Sixth Circuit has yet to prospectively toll the statute of limitations on grounds of incompetency, the Ninth Circuit has utilized this practice, albeit under different circumstances.  In <u>Calderon v. U. S. District Court (Kelly V)</u>, 163 F.3d 530 (9th Cir. 1998), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Woodford v. Garceau</u>, 538 U.S. 202 (2003), the Ninth Circuit held that a prisoner's incompetence is grounds to equitably toll the statute of limitations.  There, the petitioner sought to file an untimely habeas petition.  The Ninth Circuit tolled the one-year limitations provision finding, "[w]hen a putative habeas petitioner's mental competency is at issue, and the record discloses a genuine basis for concern, it is appropriate to toll the AEDPA's time bar until a reasonable time period after the district court makes a competency determination."  <u>Id.</u> at 541 (citations omitted).

Although the Ninth Circuit was presented with the circumstance of a petitioner who sought a tolling of the statute <u>prior</u> to the filing of the petition, its authority lends support to this Court's conclusion that it must dismiss this matter without prejudice and prospectively toll the statute of limitations.  Unlike the exhaustion cases outlined above, Carter's absence from federal court could prove indefinite.  As Dr. Stinson concluded, Carter's prognosis is poor because of his limited response to anti-psychotic medication. He opined that Carter likely will continue to experience severe symptoms of schizophrenia until a new medication arrives that could control his disease.  (Dkt. #172, at 30).

Because of the potentially lengthy time that may transpire until Carter can be restored to competency, the Court finds the better course for it to take is to dismiss the matter without prejudice and prospectively toll the statute of limitations under the

-24-

authority of <u>Hargrove</u>.  This outcome permits Carter to preserve the right to an adjudication on the merits of his federal habeas claims while considering the length of time this claim might remain pending on the district court's docket while Carter is restored to competency.[3]

Finally, while the Court understands that its decision today may have the effect of indefinitely staying Carter's execution, it notes that, the Supreme Court has accepted such a result in instances where a petitioner's mental capabilities are at issue.  <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002); <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986).  The Court also recognizes its decision affects the Respondent's ability to promptly enforce its criminal judgments.  Because the Supreme Court has countenanced this result regarding a petitioner's ability to be executed, the Court's sees no significant departure from that precedent by applying it earlier in the capital appeals process.

## VI. CONCLUSION

For the foregoing reasons, the Court **DISMISSES WITHOUT PREJUDICE** the

---

[3]     Although finding <u>Brigano</u>'s authority persuasive in this matter, the Court acknowledges that in a recent opinion, it refrained from extending its application.  <u>Bozsik v. Bagley</u>, No. 1:03-CV-1625, 2008 WL 4191141 (N. D. Ohio Sept. 8, 2008).  The <u>Bozsik</u> case, however, is easily distinguishable.  There, another judge on this Court had dismissed a habeas petition without prospectively tolling the statute of limitations.  While his claims were still pending in state court, the petitioner returned to federal court, seeking assurances pursuant to the <u>Hargrove</u> holding that he could re-file the petition at a later date.  The Court held that such a motion was premature.  <u>Id.</u> at *6.  Thus, the Court's decision not to extend the <u>Hargrove</u> holding to <u>Bozsik</u> was based on the premature filing of the motion to reinstate the habeas petition, an issue which is obviously different from what the Court encounters here.

instant matter.  In so doing, it prospectively tolls the one-year statute of limitations set forth in 28 U.S.C. § 2244(d), pursuant to the authority of <u>Hargrove v. Brigano</u>, 300 F.3d 717 (6th Cir. 2002), until such time as the Petitioner, Sean Carter, is competent to proceed with his federal habeas litigation.[4]

      IT IS SO ORDERED.

<u>S/Peter C. Economus - 9/29/08</u>
PETER C. ECONOMUS
UNITED STATES DISTRICT JUDGE

---

[4]     If the State were to conclude that Carter's competence is restored at any point in the future, it would not have to wait for Carter to re-file a habeas petition to proceed.  With no litigation pending in either state or federal court, the State can move the Ohio Supreme Court to set a date for Carter's execution.  If that circumstance were to occur, Carter would then be subject to the holding in <u>Ford</u> and the competency test attendant thereto.  If the state courts were to adjudicate Carter competent, he could then return to federal court in pursuit of habeas relief.  Thus, the State has the opportunity to enforce its judgment should it believe Carter has been restored to competency and Carter also has the opportunity to litigate his federal habeas claims.