PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SEAN CARTER, | ) | |
| | ) | CASE NO.  3:02CV524 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| MARGARET BRADSHAW, | ) | |
| | ) | **ORDER** |
| Respondent. | ) | [Resolving ECF No. 129] |

Before the Court is Petitioner Sean Carter's amended petition for writ of habeas corpus,
filed pursuant to 28 U.S.C. § 2254.[1]  Through this petition, Carter challenges the constitutionality
of his convictions and death sentence, rendered by an Ohio court.  ECF No. 129.  Respondent
Margaret Bradshaw[2] ("the State") filed an amended return of writ.  ECF No. 138.  Carter then
filed an amended traverse.  ECF No. 226.  For the following reasons, the Court denies Carter's
amended petition for writ of habeas corpus.

**FACTUAL HISTORY**

On September 25, 1997, an Ohio county grand jury indicted Carter for the aggravated
murder and rape of his adoptive grandmother, Veader Prince.  The Ohio Supreme Court set out

---

[1]  This case was transferred to the undersigned from United States District Court
Judge Peter C. Economus on June 1, 2011.

[2]  From the parties' filings, it appears that Norm Robinson, not Margaret
Bradshaw, is the current Warden.  For consistency with the docket, however, the Court
continues to list Margaret Bradshaw as the defendant.

(3:02CV524)                                                                                    2

the following account of Carter's crime upon considering Carter's direct appeal of his conviction

and sentence:

Evely Prince Carter adopted Sean Carter when he was ten years old. Carter had been taken from his birth mother in 1981, due to neglect and abuse. Evely Carter lived in close proximity to her mother, Veader Prince ("Prince"), the victim in this case. In February 1997, Carter had been thrown out of Evely Carter's house and began living with Prince, his adoptive grandmother. He stayed there until July 1997, when he was incarcerated at the Geauga County Jail for theft.

On Saturday, September 13, 1997, Vernon Prince, Prince's son, stopped by to see his mother and noticed Carter sleeping in her house. Prince was not there. As Vernon Prince was leaving, Prince pulled in the driveway and upon being questioned, told Vernon Prince that she did not know that Carter was there. Prince and Vernon Prince went inside the house and Prince talked to Carter. When she came out of the room where Carter had been sleeping, Prince asked Vernon Prince to give Carter the keys and title to his car (blue 1984 Chevette) so that Carter could leave. Vernon Prince complied with this request. Vernon Prince also gave his mother some money ($250) before he left. At that time, Carter was still in Prince's house.

That same day, Evely Carter worked from 2:00 p.m. until 10:00 p.m. During her shift, she received a telephone call from her husband, informing her that Carter had been released from jail. She stopped at Prince's house after she got off work, arriving at 10:45 p.m. She tried to enter the door and found that it was locked, something her mother had never done. She knocked on her mother's window and then her mother opened the door.

Prince explained to Evely Carter that the door was locked because she "told that boy [Carter] that he wasn't allowed to come back here." When Evely Carter saw her mother that night, Prince was wearing a white turban with a long john top underneath a white T-shirt and long john bottoms.

Evely Carter went to work the next day, Sunday, September 14, and did not get off work until 11:00 p.m. Her husband called her at work and told her that she should check on her mother because no one could find her. Evely Carter went to Prince's house. She entered and called out for her mother. There was no answer. She left Prince's house to get her husband and returned with him to Prince's house. At that time it was midnight.

Also on Sunday, another of Prince's sons, Travis Prince, had gone to Prince's house around 10:00 a.m. He had walked into her bedroom and heard

(3:02CV524)                                                                                                    3

water running in the bathroom. Though the door to the bathroom was closed, he
could tell the light was on. He went into the kitchen of the house and saw chicken
in a pot on the stove, simmering. Travis Prince left the house.

When he returned later in the day, he saw the same scene. This time, he
opened the bathroom door, and upon discovering that it was empty, he turned the
water off. He yelled for his mother and, getting no answer, became alarmed. He
returned to the kitchen to turn off the stove and then began going through each
room calling for his mother.

After searching the house and yard, he returned to the kitchen and noticed
a note on the table that said, "Took Sean to the hospital." At that point he had not
noticed any blood in the house. He did not think it was Carter, because he
believed that Carter was still in the county jail. Since he could not find her, her
purse, or her keys, he decided that his mother must have given a ride to someone,
and ceased being concerned. Travis Prince left the house around 7:00 p.m., and
returned to his apartment.

When he arrived home, he called his brother-in-law, Jerry Carter (Evely
Carter's husband), and asked if he had seen Prince, but he had not. Jerry Carter
went to Prince's house and could not find Prince. He told Travis Prince that Evely
Carter would check again at 11:00 p.m., after she got off work. Travis Prince met
the Carters at his mother's house around 11:15 p.m., and talked to neighbors to
see if they knew anything about Prince's absence. Jerry and Evely Carter and their
nephew, James Shoper, began to search the area.

They searched the garage and the cars in the driveway. Evely Carter
noticed a garbage bag with clothes in one of the vans. They went back into the
house, and then down into the basement. Evely Carter noticed a chair that had
blood on it. As they continued searching the basement, they saw Prince's feet
sticking out of a pile of clothes on the basement floor. They called the police
immediately.

Once the clothes were removed, Prince was found lying face down on the
basement floor. She was wearing only a white T-shirt, which was covered with
blood and had holes. Her glasses were pushed up on her head and one of the
lenses was missing, found later on the floor of the basement. Her dentures were
discovered in the master bedroom. Prince's body appeared to have lacerations on
her hands and face. Police found significant bloodstains on the carpet in the
master bedroom, on a couch, and on the mattress. They also found droplets and
stains of blood on the stairs and the walls leading to the basement.

(3:02CV524)                                                                                               4

An autopsy revealed that Prince had suffered eighteen stab wounds, a subarachnoid hemorrhage caused by blunt trauma, abrasions, and contusions to her right thigh. The left side of her face was swollen, indicating blunt trauma. One stab wound nicked the aorta, which was the immediate cause of death. Other forensic testing revealed the presence of sperm, located on a swab taken from the rectum of the victim. The swabs taken of the mouth and vagina were negative. DNA testing matched the rectal swab to Carter.

After talking to the family during the investigation, the police placed a "pick-up and hold" order on Carter. They learned that another of Prince's sons had been in jail with Carter, and that Carter had made a remark to him about not getting along with his grandmother.

On September 15, 1997, Daniel Hepler, a police officer with the Chippewa Township Police in Beaver County, Pennsylvania, was on patrol when he noticed a vehicle backed in among some small trees. The car had Ohio plates and he called the dispatcher to run the plate number. Hepler approached the vehicle and noticed a person (Carter) sleeping in the back seat. He knocked on the window and asked Carter to get out of the car. Carter had no identification or registration information for the vehicle. Carter told Hepler his name was "Bill Carl" and gave him a date of birth; a computer search revealed that no such person existed. The license plate information came back as registered to a Chrysler vehicle, even though the vehicle was a Chevrolet. Because the name and date of birth provided by Carter were false and the car's registration was fraudulent, Hepler told Carter that he was going to issue a citation and tow the car.

While waiting for the tow truck to arrive, Hepler did a plain view inspection of the car for personal effects. Carter stated he did not want anything from the car. Hepler found two sets of keys and some money, which he gave to Carter. When the tow truck arrived, Hepler transported Carter to the police department. Carter appeared confused and kept asking Hepler where he was.

When the vehicle registration came back as not matching the vehicle, Hepler obtained the vehicle identification number (VIN) and ran it through the computer. The car was registered to Vernon Prince. Hepler obtained a phone number and telephoned the Prince residence. The woman who answered the phone informed Hepler that the man he had in custody was wanted for murder.

Hepler contacted the Trumbull County Sheriff's Department and verified that Carter was wanted for questioning relating to a murder. Carter was placed in a holding cell while detectives from the sheriff's department traveled to Pennsylvania.

(3:02CV524)                                                                                      5

Major James Phillips, Sergeant Hyde, and Lieutenant Borger traveled to Chippewa Township to question Carter. After giving Carter his Miranda warnings and obtaining a waiver of his rights, Phillips and Hyde obtained an audio and video confession to the murder of Veader Prince.

According to Carter's confession, after he obtained the car keys from Vernon Prince, he left Prince's house and drove around for a while. He attempted to stay at his aunt's house, but could not. He returned to Prince's house and, since the door was locked, climbed through the bedroom window. He had called out to Prince, hoping to convince her to allow him to stay there for a week. They got into an argument and Prince told him to leave. He kept telling her that he had nowhere to go.

She tried to push him out the door and he started to beat her. At some point, he got a knife from the kitchen and started stabbing her. He described it as just "going off" and could not provide exact details of what happened during the assault, although he did remember hitting her in the face and stabbing her in the neck.

The next thing Carter remembered was being in the kitchen and washing his hands and the knife. He walked downstairs and saw Prince on the basement floor and then started to cover things up. He covered her with some clothes, moved the couch in her bedroom to cover up blood on the carpet, turned the water on in her bathroom and closed the door, and put a chicken in a pot on the stove and turned the stove on. He left a note on the kitchen table saying, "Took Sean to the hospital" in case someone saw blood in the house. He changed his clothes, since they were bloody. He then took about $150 from her purse and left.

He originally took her keys, thinking he would take one of her vans, and actually put his bag of clothes in the van, but could not get the van started. He got into Vernon Prince's car and drove off. Since he did not have a license plate, he stopped to steal a plate from a car in Garrettsville. To remove and transfer the plates to his car, he used the knife that he had stabbed his grandmother with.

Upon direct questioning by the officers, Carter denied taking off his grandmother's clothes or raping her, but admitted she was wearing only a T-shirt when he left her. After Carter signed a waiver allowing his car to be searched, the knife was found in the car. He waived extradition and was brought back to Ohio for prosecution.

*State v. Carter*, 89 Ohio St. 3d 593, 593–97, 734 N.E.2d 345, 347–50 (Ohio 2000).  These facts are entitled to a presumption of correctness until rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010).

**PROCEDURAL HISTORY**

### A.    State-Court Proceedings

The Trumbull County Grand Jury indicted Carter on four counts on September 25, 1997. The first count was for aggravated murder in violation of Ohio Rev. Code § 2903.01(B).  The aggravated murder charge carried three capital specifications: that the murder was committed while Carter was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated burglary, aggravated robbery, and rape, all in violation of Ohio Rev. Code § 2929.04(A)(7).  Carter also was indicted for aggravated burglary in violation of Ohio Rev. Code § 2911.11(A)(1); aggravated robbery in violation of Ohio Rev. Code § 2911.01(A)(1) and/or § 2911.01(A)(3); and rape in violation of Ohio Rev. Code § 2907.02(A)(2). App. vol. I at 51–53.

Carter's trial commenced on March 12, 1998.  Trial Tr. vol. VIII at 2237.  Attorneys Anthony Consoldane and James Lewis represented him.  On March 20, 1998, a jury found Carter guilty of  aggravated murder and two of the capital specifications, those relating to aggravated robbery and rape.  The jury also found Carter guilty of aggravated robbery, rape, and the lesser-included offense of criminal trespass on the aggravated burglary charge.  Trial Tr. vol. XV at 3243–45.  Following a mitigation hearing, on March 26, 1998, the jury rendered a verdict of death for the aggravated murder of Prince.  Trial Tr. vol. XVI at 3408.  On April 2, 1998, the trial court adopted the recommendation of the jury and sentenced Carter to death for aggravated

(3:02CV524)                                                                                                    7

murder. *Id*. at 3421–22. The court also sentenced Carter to a thirty-day term of imprisonment

for the criminal-trespass conviction, ten years for the aggravated-robbery conviction, and ten

years for the rape conviction. *Id*. at 3413-14.

Carter filed a timely appeal to the Trumbull County Court of Appeals on May 11, 1998.

App. vol. III at 4–5. He was represented by Thomas Zena and John Juhasz. *See id*. at 63. He

raised fourteen propositions of law, which he stated as follows:

1. Failure to allege every element of a crime in the indictment results in a void conviction; and, in a capital case where the death penalty specification is based upon such offense, the death sentence is likewise void. Ohio Const. art. I, §§ 1, 2, 9, 10, and 16.

2. Failure of a trial court to instruct a jury on lesser[-]included offenses, when warranted by the evidence, deprives a capital defendant of the ability to remain free from cruel and unusual punishment, and deprives a capital defendant of due process of law because the failure to instruct on lesser[-]included offenses impermissibly restricts the jury's choice to a finding of guilty on capital murder or acquittal. Ohio Const. art. I, §§ 1, 2, 9, and 16; U.S. Const. amend. VIII and XIV.

3. A criminal defendant is denied his right to a fair trial in violation of U.S. Const. amend. VI and XIV, and Ohio Const.[] art. I, §§ 1, 2, 5, 10, and 16[,] when the prosecuting attorney impermissibly bolsters witness['s] testimony and engages in misconduct and improper argument.

4. U.S. Const. amend. XIV and Ohio Const. art. I, §§ 1, 2, and 16, require [the] trial court, when presented with bona fide evidence and good faith claims that a criminal defendant is incompetent to stand trial, to examine all reasonably available evidence.

5. Ineffective assistance of counsel violates not only a capital defendant's rights to effective counsel under U.S. Const. amend. VI and XIV[,] and Ohio Const. art. I, §§ 1 and 10; but also rights to a fair and impartial jury trial and a reliably determined sentence, as guaranteed by [] U.S. Const. amend.[] V, VI, VIII, and XIV and by Ohio Const.[] art. I, §§ 5, 9, 10, and 16.

(3:02CV524)                                                                                          8

6.      A reviewing court may not compare death sentences only with other death sentences and still follow the constitutional demands for a proportionality review, nor may a reviewing court conduct a meaningful proportionality review without sufficient data on jurors' rationale for choosing a life sentence over the death penalty, for to do so violates the guarantees of U.S. Const. amend. VIII and XIV; Ohio Const. art. I, §§ 1 and 9.

7.      The Ohio capital laws, both as enacted and as interpreted, deny a capital defendant meaningful appellate review, an indispensable ingredient in imposing a death sentence consistent with U.S. Const. Amend. VIII and XIV and Ohio Const. art. I, §§ 1, 2, 9, and 16.

8.      Ohio Const. art. IV, §§ 2(B)(2)(c) and 3(B)(2), as amended, deprive[] a defendant sentenced to death [of] due process of law, equal protection of the laws, Ohio Const. art. I, §§ 1, 2, and 16; and the exercise of a weight[-]of[-]the[-]evidence review by the Supreme Court of Ohio is not authorized by the Ohio Constitution.

9.      Ohio's death penalty law, Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 violates U.S. Const. amend. V, VI, VIII, and XIV and the immunities specified in Ohio Const.[] art. I, §§ 1, 2, 5, 9, 10, and 16.

10.     The preclusion of a mercy instruction prohibits trial juries from recommending life sentences where the aggravating circumstances outweigh the mitigating factors, but the jurors nonetheless conclude that the death sentence is not appropriate; therefore, Ohio's death penalty, with its mandatory death sentences[,] under certain circumstances violate[s] the state and federal constitutions.

11.     The Ohio death penalty law involves an excessive and imprecise use of government power so as to encroach upon the "inalienable" liberties specified in the Ohio Constitution; Ohio Const. art. I, §§ 1, 2, 9, 10, 16, and 20.

12.     Fundamental fairness and due process prohibits executions as a form of punishment. U.S. Const. amend. XIV; Ohio Const. [a]rt. I, § 16.

13.     The death penalty violates U.S. Const. amend. VIII and XIV and Ohio Const. art. I, §§ 1, 2, 9, and 16[,] since the methods of execution violate evolving standards of human decency, an integral part of due process.

(3:02CV524)                                                                                                     9

> 14.    Imposition of a sentence of death upon a youthful offender with a poor
>        family upbringing, inattention to psychological problems, and a resulting
>        psychosis or antisocial personality is cruel and unusual punishment. U.S.
>        Const. amend. VIII and XIV; Ohio Const. art. I, § 9.

App. vol. III at 65–76.  The Ohio Supreme Court affirmed Carter's conviction and death sentence

on September 13, 2000.  *Carter*, 89 Ohio St. 3d at 611, 734 N.E.2d at 360.

Carter, still represented by Attorneys Juhasz and Zena, also appealed his conviction and

sentence through state post-conviction proceedings, pursuant to Ohio Rev. Code § 2953.21.  On

April 13, 1999, he filed a petition to vacate or set aside his conviction in the Trumbull County

Court of Common Pleas, which raised the following six causes of action:

> 1.    The judgment against Petitioner is void or voidable because of the
>       ineffective assistance of counsel.

> 2.    Petitioner's conviction and death sentence is void or voidable because
>       petitioner's trial counsel failed to a) present all evidence of petitioner's
>       incompetence, b) make a complete record on petitioner's behalf so that
>       petitioner could defend his life and liberty on appeal if convicted; and c)
>       present, through direct or cross examination, all expert evidence of
>       petitioner's incompetence to stand trial.

> 3.    Remarks made by the prosecutor prejudicially affected substantial rights of
>       the Petitioner to a fair trial, to effectively defend his life and liberty, to
>       equal protection and benefit of the laws, to be free from cruel and unusual
>       punishment, to have justice administered without denial and to due process
>       of the law.

> 4.    Petitioner was denied the effective assistance of trial counsel when his
>       counsel failed to object to the improper comments of the prosecutor
>       described in the previous cause of action.

> 5.    Petitioner's conviction and death sentence are void or voidable because
>       petitioner's trial counsel failed to investigate possible mitigating factors by
>       making a thorough review of the Petitioner's background.

> 6.    In order to have meaningful access to the courts, Petitioner must be
>       afforded the opportunity to conduct discovery to develop the evidence

(3:02CV524)                                                                                               10

>which exists but which has not been made available to Petitioner, so that
>he may establish in a court of law the constitutional violations herein
>asserted, and the corresponding reasons why Petitioner's convictions and
>death sentences are void.

App. vol. IV at 2, 6, 15, 17, 18, 18–19, 19.  The trial court dismissed Carter's post-conviction

petition on August 30, 1999.  *Id*. at 80–94.

Carter, represented by Attorney Juhasz, appealed the trial court's dismissal of his post-

conviction petition on September 29, 1999.  *Id*. at 95.  He raised the following two assignments

of error:

1.  The trial court erred in denying Appellant an evidentiary hearing on his
    petition for post-conviction relief, . . . thus depriving Appellant of liberties
    secured by U.S. Const. amend. VI and XIV, and Ohio Const. art. I, §§ 1, 2,
    10, and 16, including meaningful access to the courts of this State.

2.  The trial court erred in applying the principles of *res judicata*, . . . thus
    depriving Appellant of liberties secured by U.S. Const. amend. VI and
    XIV, and Ohio Const. art. I, §§ 1, 2, 10, and 16.

App. vol. V at 10–11.  The Trumbull County Court of Appeals affirmed the trial court's decision.

*State v. Carter*, 2000 Ohio App. LEXIS 5935 (Ohio App. Dec. 15, 2000); App. vol. V at 185–

200.

Carter, still represented by Attorney Juhasz, then appealed that judgment to the Ohio

Supreme Court on February 1, 2001.  App. vol. V at 201–03.  He set forth the following two

propositions of law:

1.  Denial of an evidentiary hearing where a petition for post conviction relief
    states operative facts is a denial of meaningful access to the courts of this
    State in contravention of Ohio Constitution, Article 1, §§ 1 and 16; U.S.
    Constitution Amendment XIV.

(3:02CV524)                                                                                              11

> 2.    *Res judicata* may not be applied to defeat claims raised in a post conviction petition where a direct appeal is still pending and the matter raised in the petition has not been previously adjudicated.

App. vol. VI at 6.  The court declined jurisdiction and dismissed the appeal on May 2, 2001.

*State v. Carter*, 91 Ohio St. 3d 1509, 746 N.E.2d 612 (2001); App. vol. VI at 62.

On January 15, 2003, Carter filed an application to reopen his direct appeal, or a *Murnahan* application, in the Ohio Supreme Court, pursuant to Rule XI, § 5 of the Ohio Supreme Court Rules of Practice.  App. vol. III at 499–511.  He was represented by Linda Prucha of the Ohio Public Defender's Office.  In his application, he asserted that his appellate counsel failed to raise before the Ohio Supreme Court all instances of prosecutorial misconduct and ineffective assistance of counsel, and failed to ensure that he was competent to stand trial and to safeguard his right to be present.  *Id*. at 501–06.  The court denied the application on March 19, 2003.  *State v. Carter*, 98 Ohio St. 3d 1486, 785 N.E.2d 470 (Ohio 2003); App. vol. III at 548.

**B.    Federal Habeas Proceedings**

On March 19, 2002, Carter's counsel, Linda Prucha and Christa Hohmann from the Ohio Public Defender's Office, initiated habeas corpus proceedings by filing a suggestion of incompetence, a  motion to proceed in forma pauperis, an *ex parte* motion requesting the appointment of a mental health expert to assist counsel in assessing Carter's competency, and a motion for appointment of counsel.  ECF Nos. 1, 3, 6, 7.  The Court granted the motion for appointment of counsel, appointing Attorneys Prucha and Hohmann.  ECF No. 8.  Carter, who was housed at the time at a prison psychiatric facility due to mental illness, had denied requests to meet with representatives from the Public Defender's Office and had indicated his desire to waive his habeas review and volunteer for execution.  The Court granted the motion for an expert

(3:02CV524)                                                                                                            12

evaluation, but Carter later withdrew the request after meeting with counsel and acknowledging

his wish to proceed with his habeas case.  ECF Nos. 10, 26.

On April 11, 2002, Carter filed an *ex parte* motion for an order directing the Ohio

Department of Rehabilitation and Correction ("ODRC") to provide a copy of Carter's prison

records, which the Court granted on April 23, 2002.  ECF Nos. 9, 11.  Carter filed a petition for

writ of habeas corpus on May 1, 2002.  ECF No. 13.  He filed an amended petition on January 6,

2003.  ECF No. 39.

Carter filed a motion to stay these proceedings and hold this case in abeyance pending

exhaustion of state-court remedies on January 6, 2003, which the State opposed.  ECF Nos. 40,

41.  The Court granted the motion on February 20, 2003.  ECF No. 45.  On April 17, 2003,

Carter notified the Court that he had completed his additional state-court proceedings.  ECF No.

47.  On May 1, 2003, Carter substituted Attorney Hohmann with Attorney Siobhan Clovis.  ECF

No. 50.  The State filed a return of writ on September 16, 2003.  ECF No. 79.

Carter filed a motion for leave to conduct discovery on October 15, 2003, which the State

opposed.  ECF Nos. 80, 92.  The State filed a motion for leave to expand the record on October

16, 2003, which the Court granted that same day.  ECF Nos. 81, 84.  The Court granted Carter's

request for discovery on December 17, 2003.  ECF No. 94.

Carter filed a second amended habeas petition on April 12, 2004.  ECF No. 99.  On April

28, 2004, Carter substituted Attorney David Hanson for Attorney Clovis.  ECF No. 103.  The

State filed an amended return of writ on May 7, 2003.  After twice requesting and receiving

additional time, Carter filed his traverse on July 12, 2004.  ECF No. 109.  The State replied to

Carter's traverse on July 23, 2004.  ECF No. 113.

(3:02CV524)                                                                                          13

On July 12, 2004, Carter also filed a motion for evidentiary hearing.  ECF No. 110.  He further requested expert assistance to review medical records and the appointment of a neuropsychologist, which the Court granted.  ECF Nos. 111, 116, 117.  The State opposed Carter's motion.  ECF No. 112.  On May 9, 2005, Carter substituted Attorney Hanson with Attorney Melissa Callais.  ECF No. 120.  Carter twice requested, on April 18, 2005, and June 13, 2005, additional time for expert testing and evaluation, which the Court granted.  ECF Nos. 118, 119, 123, 127.

On October 3, 2005, Carter filed a third amended habeas petition.  ECF No. 129.  Also that day, he filed a motion to expand the record and a motion for a competency determination and to stay his habeas proceedings.  ECF Nos. 130, 132.  The State opposed Carter's motion for a competency determination and to stay, and opposed in part his motion to expand the record.  ECF Nos. 134, 135.  On November 28, 2005, the State filed an amended return of writ.  ECF No. 138.

On November 29, 2005, the Court granted in part and denied in part Carter's motion to expand the record and granted Carter's motion for competency determination.  It scheduled a hearing on Carter's mental competency and stayed the case until it issued a ruling on that matter.  ECF No. 139.  On December 5, 2005, the State filed a motion to have Carter evaluated by the State's expert, which the Court granted on December 8, 2005.  ECF No. 142, 143.  On January 24, 2006, Carter filed a motion to expand the time for the evidentiary hearing, which was granted.  ECF Nos. 152, 153.  On April 20, 2006, the State filed a motion for an order to convey Carter to the Court for the hearing, which Carter opposed and the Court denied.  ECF Nos. 155,

(3:02CV524)                                                                            14

156.  The Court conducted a five-hour hearing regarding Carter's competency to proceed in

federal habeas on May 1, 2006.  ECF No. 172.

On May 2, 2006, the Court ordered Carter's counsel to arrange for both parties' experts to

observe Carter interacting with his counsel, and ordered the experts to file reports with the Court

regarding their observations.  ECF No. 171.  Carter objected on the ground of attorney-client

privilege on May 23, 2006, and the State replied.  ECF No. 173.  On October 5, 2006, the Court

ordered that the observation should proceed.  ECF No. 178.  Carter then moved to certify the

issue for appeal on October 27, 2006, which the State opposed.  ECF Nos. 179, 182.  The Court

denied the certificate of appeal on February 1, 2007, but granted Carter a stay during the

pendency of his pursuit of a writ of mandamus from the Sixth Circuit Court of Appeals.  ECF

No. 184.  On November 5, 2007, the Sixth Circuit granted Carter's request for mandamus relief

and set aside the Court's order requiring Carter to be observed by the State's expert witness

while interacting with his habeas counsel.  ECF No. 186.

On December 7, 2007, Carter filed a motion for an order directing the ODRC to provide

updated records, which the State did not oppose.  ECF Nos. 187, 190.  The Court granted the

motion on March 20, 2008.  ECF No. 192.  The parties also filed supplemental briefs regarding

Carter's competency.  ECF Nos. 194, 195, 196.  On September 29, 2008, the Court dismissed

this case without prejudice and prospectively tolled the petition's one-year statute of limitations

until Carter regained competency.  ECF Nos. 197, 198.

The State appealed the Court's order on October 20, 2008.  ECF No. 199.  On May 26,

2011, the Sixth Circuit amended the Court's judgment to order that Carter's petition be stayed

indefinitely with respect to any claims that require his assistance.  *Carter v. Bradshaw*, 644 F.3d

(3:02CV524)                                                                                          15

329, 337 (6th Cir. 2011).  It concluded that although "[f]ederal habeas petitioners facing the

death penalty for State criminal convictions do not enjoy a constitutional right to competence,"

such a right can be found in 18 U.S.C. § 4241.  Id. at 333–34.

On January 8, 2013, the United States Supreme Court unanimously vacated the Sixth

Circuit's decision.  Ryan v. Gonzales, 133 S. Ct. 696 (2013).[3]  It held that 18 U.S.C. § 4241 does

not confer upon incompetent federal habeas petitioners a statutory right to suspend their habeas

proceedings.  Id. at 706–07.  It found that three of the claims that the district court determined

might potentially benefit from Carter's assistance were adjudicated on the merits in state post-

conviction proceedings.  Id. at 709.  Therefore, the Court concluded, these three claims were

subject to 28 U.S.C. § 2254(d)'s deferential review.  Id.  Because, under Cullen v. Pinholster,

131 S. Ct. 1388, 1398 (2011), this type of review is confined to the record before the state court,

these claims do not allow for Carter's extra-record assistance, and, consequently, a stay.

Gonzalez, 133 S. Ct. at 709.  The Supreme Court remanded to this Court the issue of whether the

"fourth" claim, ineffective assistance of appellate counsel, warranted a stay.  Id.  The Court noted

that it was unclear from the record whether that claim was exhausted, but that if it was, its review

also would be record-based.  Id.  It further observed that even if the claim was unexhausted and

not procedurally defaulted, "an indefinite stay would be inappropriate."  Id.  Thus, the Court

instructed:

If a district court concludes that the petitioner's claim could substantially benefit

---

[3]  The Supreme Court consolidated Carter's case with that of Ernest Gonzales.  In Gonzales's case, the Ninth Circuit granted a writ of mandamus ordering the district court to stay his habeas proceedings pending a competency determination.  The Ninth Circuit found a statutory right to competence during habeas proceedings in 18. U.S.C. § 3599(a)(2).  Id. at 701.

(3:02CV524)                                                                              16

> from the petitioner's assistance, the district court should take into account the
> likelihood that the petitioner will regain competence in the foreseeable future.
> Where there is no reasonable hope of competence, a stay is inappropriate and
> merely frustrates the State's attempts to defend its presumptively valid judgment.

*Id.*

Carter, now represented by Rachel Troutman and Kelle Andrews of the Ohio Public

Defender's Office, *see* ECF Nos. 204, 213, then filed a motion for an updated competency

evaluation on May 3, 2013.  ECF No. 214.  The State opposed the motion.  ECF No. 216.  On

March 31, 2014, the Court denied the motion without prejudice.  ECF No. 221.  It found that the

remaining claim at issue, ineffective assistance of appellate counsel, was raised to the Ohio

Supreme Court, which adjudicated it on the merits.  The undersigned is therefore limited to the

state-court record under *Pinholster, supra,* and may not consider any new evidence, including an

updated competency evaluation.  *Id.* at 10–11.

On July 29, 2014, Carter filed an amended traverse.  ECF No. 226.  The Court ordered

the State to file a sur-reply on October 10, 2014, which it did on November 7, 2014, after seeking

and receiving additional time.  ECF Nos. 227, 228, 229.  This case is now ripe for adjudication.

### PETITIONER'S GROUNDS FOR RELIEF

Carter asserts nine grounds for relief.  They are:

1.    Sean Carter was incompetent at both the culpability and penalty phases of his
      trial.  Therefore, his convictions and sentence of death are in violation of his
      rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the
      United States Constitution.

2.    Sean Carter's right to effective assistance of counsel during the mitigation
      phase was violated when counsel failed to investigate, prepare, and present
      relevant mitigating evidence. U.S. Const. amend[]. VI, VIII, XIV.

(3:02CV524)                                                                          17

3.      Sean Carter's rights to a fair trial and an impartial jury were violated by prosecutor misconduct at the culpability phase of Mr. Carter's trial. U.S. Const. amend. VI and XIV.

4.      The trial court denied Sean Carter his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to instruct the jury properly at the conclusion of the culpability phase.

5.      Sean Carter was denied his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution when his attorneys failed to object and properly preserve numerous errors that occurred during the pre-trial proceedings and the culpability phase of the trial.

6.      Sean Carter was denied the effective assistance of counsel in his direct appeal as of right, in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

7.      The death penalty as administered by lethal injection in the state of Ohio violates Sean Carter's rights to protection from cruel and unusual punishment and to due process of law as guaranteed by the United States Constitution amend[]. VIII and XIV.

8.      Sean Carter is seriously mentally ill. Therefore, his death sentence is in violation of his rights under the Eighth and Fourteenth Amendments.

9.      Sean Carter will not be competent and sane to be executed. Sean's execution while he is incompetent and insane, violates the Eighth and Fourteenth Amendments to the United States Constitution.

ECF No. 129 at 7, 21, 34, 36, 37, 40, 41, 43, 48.

### STANDARD OF REVIEW

Carter's petition for writ of habeas corpus is governed by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), as it was filed after the Act's 1996 effective date. *Lindh*

*v. Murphy,* 521 U.S. 320, 336 (1997); *Murphy v. Ohio,* 551 F.3d 485, 493 (6th Cir. 2009).

AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of

state and federal criminal sentences, particularly in capital cases, and 'to further the principles of

(3:02CV524)                                                                                              18

comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting

*(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  As the United States Supreme Court

recently explained, the Act "recognizes a foundational principle of our federal system: State

courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 134 S. Ct. 10, 15

(2013).  AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners

whose claims have been adjudicated in state court." *Id.*

      One of AEDPA's most significant limitations on the federal courts' authority to issue

writs of habeas corpus is found in § 2254(d).  That provision forbids a federal court from

granting habeas relief with respect to a "claim that was adjudicated on the merits in State court

proceedings" *unless* the state-court decision either:

     (1)     resulted in a decision that was contrary to, or involved an unreasonable
             application of, clearly established Federal law, as determined by the
             Supreme Court of the United States; or

     (2)     resulted in a decision that was based on an unreasonable determination of
             the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

      Habeas courts review the "last *explained* state-court judgment" on the federal claim at

issue.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original).  A state court has

adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the

state court provided little or no reasoning at all for its decision.  *Harrington v. Richter*, 562 U.S.

86, 98 (2011) ("[D]etermining whether a state court's decision resulted from an unreasonable

legal or factual conclusion does not require that there be an opinion from the state court

explaining the state court's reasoning.").  "When a federal claim has been presented to a state

(3:02CV524)                                                                                          19

court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

 "Clearly established federal law" for purposes of the provision "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  It includes "only the holdings, as opposed to the dicta, of Supreme Court decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted).  The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent.  *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established [f]ederal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *(Michael) Williams*, 529 U.S. at 412–13.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398.

Ultimately, AEDPA's highly deferential standard requires that federal district courts sitting in habeas review give the state-court decision "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  "[A]n 'unreasonable application of' [Supreme

(3:02CV524)                                                                                          20

Court] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not

suffice." *Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer*, 538 U.S. at 75–76).  "The critical point

is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is

so obvious that a clearly established rule applies to a given set of facts that there could be no

'fairminded disagreement' on the question." *Id*. at 1706–07 (quoting *Harrington,* 562 U.S. at

102).

        A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2)

only if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003).

The petitioner bears the burden of rebutting the state court's factual findings "by clear and

convincing evidence." *Burt*, 134 S. Ct. at 15; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual

determinations, which can only be overcome by clear and convincing evidence.  28 U.S.C. §

2254(e)(1).[4]  The Supreme Court repeatedly has declined to define the "precise relationship"

between § 2254(d)(2) and (e)(1).  *Burt*, 134 S. Ct. at 15; *see also Wood v. Allen*, 558 U.S. 290,

300 (2010).  It has explained, however, that it is

        incorrect . . ., when looking at the merits, to merge the independent requirements
        of § 2254(d)(2) and (e)(1).  AEDPA does not require a petitioner to prove that a
        decision is objectively unreasonable by clear and convincing evidence.  The clear
        and convincing evidence standard is found in § 2254(e)(1), but that subsection
        pertains only to state-court determinations of factual issues, rather than decisions.

---

        [4]  Section 2254(e)(1) provides:  "In a proceeding instituted by an application for a
writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be presumed to be correct.
The applicant shall have the burden of rebutting the presumption of correctness by clear
and convincing evidence."  28 U.S.C. § 2254(e)(1).

(3:02CV524)                                                                                    21

*Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).  "[I]t is not enough for the petitioner to show

some unreasonable determination of fact; rather, the petitioner must show that the resulting state

court decision was 'based on' that unreasonable determination."  *Rice,* 660 F.3d at 250.  And, as

the Supreme Court has cautioned, "'a state-court factual determination is not unreasonable

merely because the federal habeas court would have reached a different conclusion in the first

instance.'"  *Burt*, 134 S. Ct. at 15 (quoting *Wood,* 558 U.S. at 301).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by

AEDPA, is an intentionally demanding standard, affording great deference to state-court

adjudications of federal claims.  In *Harrington v. Richter*, *supra*, the Supreme Court admonished

that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in

the result it would reach under *de novo* review," and that "even a strong case for relief does not

mean the state court's contrary conclusion was unreasonable."  *Harrington*, 562 U.S. at 102; *see

also* *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not

whether a federal court believes the state court's determination was incorrect but whether that

determination was unreasonable—a substantially higher threshold.").  Rather, § 2254(d) "reflects

the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice

systems" and does not function as a "substitute for ordinary error correction through appeal."

*Harrington,* 562 U.S. at 102-03 (internal quotation marks omitted).  Thus, a petitioner "must

show that the state court's ruling . . . was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded

disagreement."  *Id.* at 103.  This is a very high standard, which the Supreme Court readily

acknowledges:  "If this standard is difficult to meet, that is because it is meant to be."  *Id.* at 102.

(3:02CV524)                                                                                                    22

Nevertheless, the Supreme Court recognized in *Harrington* that AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief." *Miller-El*, 537 U.S. at 340.  Rather, "under AEDPA standards, a federal court can disagree with a state court's factual determination and 'conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.'" *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340) (Posner, J.).

Federal courts, therefore, retain statutory and constitutional authority, absent suspension of the writ,[5] to remedy detentions by state authorities that violate federal law, as long as AEDPA's limitations are observed.  *Rice*, 660 F.3d at 251.  And the deference AEDPA demands is not required if those limitations do not apply.  Federal habeas courts may, for example, review *de novo* an exhausted federal claim when a state court misapplied a procedural bar and did not review the claim on the merits.  *See, e.g.*, *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions.  *See Wiggins*, 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong); *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) (holding that the unreasonable application of Supreme Court precedent under § 2254(d)(1) permitted a plenary review of the "underlying [] claim . . . unencumbered by the deference

_____

[5] *See* U.S. Const. art. I, § 9 cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

AEDPA normally requires"); *see also Rice,* 660 F.3d at 252 (citing *Henness v. Bagley,* 644 F.3d 308 (6th Cir. 2011), and *Smith v. Bradshaw*, 591 F.3d 517, 522, 525 (6th Cir. 2010) (each applying *de novo* review to federal habeas claims where none of the AEDPA limitations applied)).

### EXHAUSTION AND PROCEDURAL DEFAULT

In addition to § 2254(d)'s limitations, AEDPA precludes habeas review of some claims that have not been properly exhausted before the state courts, or were procedurally barred by the state courts.

### A.      Exhaustion

Section 2254(b)(1) provides that a federal court may not award habeas relief to an applicant in state custody "unless it appears that—the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  "This requirement, however, refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir. 1994).

When a habeas court finds a claim to be unexhausted, it can, for good cause, stay the action and permit the petitioner to present his unexhausted claim to state court and then return to

(3:02CV524)                                                                                                    24

federal court for review of his perfected petition.  *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

The court need not wait for exhaustion, however, if it determines that a return to state court

would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In addition, AEDPA's §

2254(b)(2) permits courts to deny unexhausted habeas claims on the merits when appropriate.

28 U.S.C. § 2254(b)(2); *see also Rhines v. Weber,* 544 U.S. 269, 277 (2005) (a habeas court may

deny unexhausted claims that are "plainly meritless"); *Hanna v. Ishee,* 694 F.3d 596, 610 (6th

Cir. 2012) (denying petitioner's claim on the merits "notwithstanding a failure to exhaust" the

claim).

  The exhaustion doctrine is not a jurisdictional limitation on the federal courts.  *See, e.g.,*

*Pudelsky v. Wilson*, 576 F.3d 595, 605–06 (6th Cir. 2009); *Cain v. Redman*, 947 F.2d 817, 820

(6th Cir. 1991).  Thus, a state can waive the exhaustion requirement.  *See, e.g., Harris v. Lafler*,

553 F.3d 1028, 1032 (6th Cir. 2009).  However, "[a] State shall not be deemed to have waived

the exhaustion requirement or be estopped from reliance upon the requirement unless the State,

through counsel, expressly waives the requirement."  28 U.S.C. § 2254(b)(3).  The Sixth Circuit

has ruled that where a habeas respondent has taken contradictory positions regarding a

petitioner's exhaustion of state remedies, courts will find an express waiver only where the

respondent has "manifested a clear and unambiguous intent to waive the requirement."

*D'Ambrosio v. Bagley*, 527 F.3d 489, 495 (6th Cir. 2008).

  Here, the State represents in an introductory section of its return of writ that "all of

Carter's claims are exhausted."  ECF No. 138 at 21.  Nevertheless, it adds, "Respondent

expressly **does not** waive the exhaustion requirement."  *Id.* (emphasis in original).  The State's

general disclaimer of any waiver of the exhaustion defense is not sufficiently clear and

(3:02CV524)                                                                        25

unambiguous in light of its representation that "all of Carter's claims are exhausted," combined

with its failure to assert the defense or even mention the subject again.  Accordingly, the Court

finds that the State has waived the exhaustion requirement as to each of Carter's claims, and it

will not engage in a *sua sponte* analysis of exhaustion where the State has failed to raise it.

Moreover, as noted above, even if a claim is unexhausted, the Court may deny it on the merits.

28 U.S.C. § 2254(b)(2).

### B.    Procedural Default

Even when a state prisoner exhausts available state-court remedies, a federal court may

not consider "contentions of general law which are not resolved on the merits in the state

proceeding due to petitioner's failure to raise them as required by state procedure."  *Wainwright*

*v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state

court pursuant to an independent and adequate state procedural rule, federal habeas review of the

claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as

a result of the alleged violation of federal law, or demonstrate that failure to consider the claims

will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750

(1991).  To be independent, a state procedural rule and the state courts' application of it must not

rely in any part on federal law.  *Id.* at 732–33.  To be adequate, a state procedural rule must be

"'firmly established' and 'regularly followed'" by the state courts at the time it was applied.

*Beard v. Kindler*, 558 U.S. 53, 60–61 (2009).  If a petitioner fails to fairly present any federal

habeas claims to the state courts but has no remaining state remedies, then the petitioner has

procedurally defaulted those claims.  *O'Sullivan,* 526 U.S. at 848; *Rust,* 17 F.3d at 160.

(3:02CV524)                                                                    26

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now

familiar test to be followed when the state argues that a habeas claim is defaulted because of a

prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that
> is applicable to the petitioner's claim and whether the petitioner failed to comply
> with that rule. Second, the federal court must determine whether the state courts
> actually enforced the state procedural sanction -- that is, whether the state courts
> actually based their decisions on the procedural rule. Third, the federal court must
> decide whether the state procedural rule is an adequate and independent state
> ground on which the state can rely to foreclose federal review of a federal
> constitutional claim. Fourth, if the federal court answers the first three questions
> in the affirmative, it would not review the petitioner's procedurally defaulted
> claim unless the petitioner can show cause for not following the procedural rule
> and that failure to review the claim would result in prejudice or a miscarriage of
> justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin,* 785 F.2d at 138) (further

citations omitted).

In determining whether the *Maupin* factors are met, the federal court again looks to the

last explained state-court judgment. *Ylst,* 501 U.S. at 805; *Combs v. Coyle*, 205 F.3d 269, 275

(6th Cir. 2000). If the last state court rendering a reasoned opinion on a federal claim "clearly

and expressly states that its judgment rests on a state procedural bar," then the claim is

procedurally defaulted and barred from consideration on federal habeas review.[6] *Harris v. Reed,*

489 U.S. 255, 263 (1989). Conversely, if the last state court to be presented with a particular

---

[6] An exception to this rule lies where "the later state decision rests upon a
prohibition against *further* state review," in which case the decision "neither rests upon
procedural default nor lifts a pre-existing procedural default, [and] its effect upon the
availability of federal habeas is nil . . . ." *Ylst, ,* 501 U.S. at 804 n.3. In that case, habeas
courts "look through" that later decision to the prior reasoned state-court judgment. *Id*. at
805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no
bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

federal claim reaches the merits of that claim, then the procedural bar is removed and a federal

habeas court may consider the merits of the claim in its review.  *Ylst*, 501 U.S. at 801.

As noted above, if a claim is procedurally defaulted, the federal court may excuse the

default and consider the claim on the merits if the petitioner demonstrates that (1) there was

cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged

constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on

federal habeas review.  *Coleman,* 501 U.S. at 750.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some

objective factor external to the defense impeded counsel's efforts to comply with the State's

procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Objective impediments include

an unavailable claim, or interference by officials that made compliance impracticable.  *Id.*

Second, constitutionally ineffective assistance of counsel constitutes cause.  *Id.* at 488-89.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that

ineffective-assistance claim must itself be presented to the state courts as an independent claim

before it may be used to establish cause.  *Id.*  If the ineffective-assistance claim is not presented

to the state courts in the manner that state law requires, that claim is itself procedurally defaulted

and only can be used as cause for the underlying defaulted claim if the petitioner demonstrates

cause and prejudice with respect to the ineffective-assistance claim.  *Edwards v. Carpenter*, 529

U.S. 446, 452–53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked

to his actual and substantial disadvantage."  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir.

1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to

(3:02CV524)                                                                                    28

establish cause to excuse a procedural default, a court does not need to address the issue of

prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental

miscarriages of justice, the Supreme Court has recognized a narrow exception to the cause

requirement where a constitutional violation has "probably resulted" in the conviction of one

who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004)

(citing *Murray,* 477 U.S. at 495–96).  When the Court extended this exception to claims of

capital sentencing error, it limited the exception in the capital sentencing context to cases in

which the petitioner could show "'by clear and convincing evidence that, but for constitutional

error, no reasonable juror would have found the petitioner eligible for the death penalty under the

applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

The Court will address the procedural default issues presented in this case when it

reviews Carter's individual claims.

### ANALYSIS OF PETITIONER'S GROUNDS FOR RELIEF

**I.      First and Fifth Grounds for Relief:  *Competency to Stand Trial***

Carter claims in his first and fifth grounds for relief that both the trial court and his trial

counsel failed to protect his constitutional right to be competent to stand trial.  He argues that the

trial court:

1.      Failed to consider relevant information;

2.      Relied too heavily on flawed expert testimony;

3.      Failed to raise the competency issue during the trial; and

(3:02CV524)                                                                        29

4.      Failed to obtain Carter's waiver of presence at the sentencing phase of
        trial.

ECF No. 129 at 8–19.  Carter also complains that his trial counsel provided ineffective assistance

when they:

1.      Failed to prepare experts for, and present material evidence at, the
        competency hearings;

2.      Failed to request a third competency hearing; and

3.      Failed to preserve an adequate record for appeal regarding Carter's
        incompetence during his trial.

Id. at 8–9, 13–17, 38–39.

### A.      Procedural Posture

The State concedes that Carter raised his competency claims related to ineffective

assistance of counsel in state courts, both on direct appeal and post-conviction, where they were

adjudicated on the merits.  ECF No. 138 at 32–33, 72.  These claims, therefore, are preserved for

federal habeas review.

The State argues, however, that although "Carter raised the general claim of

incompetency on direct appeal," he did not raise his competency claims relating to trial-court

error in state court, resulting in the claims' procedural default.  Id. at 29, 32–33.  Carter responds

that "[a]ny procedural default of this claim is excused by the ineffectiveness of post-conviction

counsel."  ECF No. 226 at 16.

The Court finds that Carter raised his trial-court-error competency claims on direct appeal

to the Ohio Supreme Court and in state post-conviction proceedings, and they were adjudicated

(3:02CV524)                                                                                    30

on the merits.[7]  *See* Carter, 89 Ohio St. 3d at 603–05, 734 N.E.2d at 355–56; *Carter*, 2000 Ohio

App. LEXIS 5935, at *5–13.  Over time, Carter certainly changed the emphasis of his legal

arguments and marshaled new facts to support his claim.  *See* App. vol. III at 126–36; App. vol.

IV at 14–15; *id.* at 86-88; App. vol. V at 129–31.  But the overarching constitutional basis for his

claim—that the trial court and his trial counsel failed to protect his constitutional right to

competency to stand trial—remained constant.  *See* Richey v. Bradshaw, 498 F.3d 344, 353–54

(6th Cir. 2007) ("Where the legal basis for Richey's claim has remained constant, and where the

facts developed in the district court merely substantiate it, we cannot say that the claim has been

so 'fundamentally alter[ed]' from that presented to the state court as to preclude our review.").

Thus, Carter's competency claims relating to trial-court error also are preserved for federal

habeas review.[8]

## B.    Merits

As the Supreme Court has noted, "[i]t has long been accepted that a person whose mental

condition is such that he lacks the capacity to understand the nature and object of the proceedings

_____

[7]The state post-conviction appellate court did not directly address Carter's
trial-court-error competency claims, focusing instead on Carter's ineffective-assistance
competency claims.  Its decision dismissing the claims, however, is still considered an
"adjudication on the merits" for purposes of AEDPA.  *See* Harrington 562 U.S. at 99.

[8]  The Supreme Court acknowledged as much in the *Gonzales* decision when it
stated that Carter's competency claim, which it characterized as alleging that "Carter was
incompetent to stand trial and was unlawfully removed from the trial proceedings," was
"adjudicated on the merits in state postconviction proceedings and, thus, [was] subject to
review under § 2254(d)."  Gonzales, 133 S. Ct. at 709 n.15.  *See, e.g.,* Hanover Ins. Co. v.
Am. Eng'g Co., 105 F.3d 306, 312 (6th Cir. 1997) ("It is clear that when a case has been
remanded by an appellate court, the trial court is bound to proceed in accordance with the
mandate and law of the case as established by the appellate court.") (internal quotation
marks and citation omitted).

(3:02CV524)                                                                                         31

against him, to consult with counsel, and to assist in preparing his defense may not be subjected

to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *see also Dusky v. United States*, 362

U.S. 402, 402 (1960).  For this reason, the Court has held that a trial court's failure to observe

procedures that will protect a defendant's right to competency to stand trial deprives him of his

due process right to a fair trial.  *Pate v. Robinson*, 383 U.S. 375, 385–86 (1966).

Carter's competency has been at the forefront of his case from the very beginning.  The

Ohio Supreme Court set forth the following factual account of how this issue was treated at trial:

> In his fourth proposition of law, Carter argues that he was incompetent to
> stand trial "because his paranoid personality did not permit him to trust his
> lawyers." The trial court appointed an expert to examine Carter, and a hearing on
> competency was held, after which the trial court determined that Carter was
> competent to stand trial.

> The standard for competency is set out in R.C. 2945.37(G), which
> provides: "A defendant is presumed competent to stand trial. If, after a hearing,
> the court finds by a preponderance of the evidence that, because of the defendant's
> present mental condition, the defendant is incapable of understanding the nature
> and objective of the proceedings against the defendant or of assisting in the
> defendant's defense, the court shall find the defendant incompetent to stand trial *
> * *."

> Carter does not argue that he was incapable of understanding the nature of
> the proceedings against him; instead, he focuses his argument on his inability to
> assist his defense counsel. During the first competency hearing, Dr. Stanley
> Palumbo opined, "With reasonable scientific certainty Mr. Carter is competent to
> stand trial. Mr. Carter understands the nature of the proceedings against him and
> does not suffer from any gross mental disorder that would interfere with his ability
> to participate in his defense. He does not suffer from any mood disorder such as
> depression, which would cause him to have trouble following a witness's line of
> statements or have the energy and interest in participating in his own defense in
> his own best interest."

> When questioned about Carter's relationship with his attorneys, and his
> not wanting to listen to his attorneys' advice, Dr. Palumbo commented, "It
> certainly sounds like he doesn't want to, but that's different from being able to."

(3:02CV524)                                                                                      32

The trial court found Carter competent and denied a defense request for further examination. In his findings of fact, the court stated, "Dr. Palumbo testified that the Defendant does not trust his attorney, or any other attorney[;] however, Defendant's distrust of his attorney does not exhibit paranoid behavior since he distrusts all attorneys and not specifically his attorney."

After the trial court found that Carter was competent, Carter entered a plea of not guilty by reason of insanity. The court appointed three experts to examine Carter for sanity at the time of the offense—Dr. Steven A. King, Dr. Robert Alcorn, and Dr. Stanley Palumbo.

During Dr. King's interview with Carter, the doctor became concerned that Carter was not competent to stand trial. This concern prompted an evaluation on that issue by the other two doctors, and a second competency hearing. Carter waived his presence at the hearing.

Dr. King testified that Carter exhibited bizarre behavior during his interview and indicated that he wanted to kill Tony Consoldane, his attorney. King further testified that Carter's thoughts kept him from cooperating with counsel. In Dr. King's opinion, Carter was not able to assist in his own defense. On cross-examination, King admitted that the question of competence was a close call.

Dr. Palumbo did not change his prior opinion of competence after he re-examined Carter. He acknowledged that Carter expressed anger and irritability with his attorneys, but added that it was not unusual for defendants to be upset with their attorneys.

Dr. Alcorn also examined Carter concerning Carter's relationship with his attorney. Alcorn testified that Carter did not think his attorney was doing a very good job, and that that was not an uncommon reaction given the situation Carter was in. He determined Carter to be competent to stand trial.

At the conclusion of the second hearing, the trial court again found Carter competent to stand trial, stating, "I would indicate for the record that the distrust and/or hostility that a defendant has with an attorney, his own attorney, does not necessarily equate with competence."

*Carter*, 89 Ohio St. 3d at 603–04, 734 N.E.2d at 355–56.

The court went on to note that "Carter did not want to attend the court proceedings, indicating that he just wanted to enter a plea and get it over."   *Id.* at 605, 734 N.E.2d at 356.  It explained in a footnote:

> The record indicates that Carter was not happy about being shackled for court proceedings. Defense counsel waived Carter's presence for some preliminary hearings, and Carter himself waived his right to be present at the second competency hearing. Prior to the defense opening statement, Carter asked if he had to go through trial, or could he just plead guilty. A hearing out of the jury's presence was held and Carter stated he did not want to attend the trial. The trial court indicated some concerns about his waiving his presence at trial and Carter lunged at the judge in order to be removed from the courtroom. Carter watched the remainder of the trial from another room by remote video. Throughout the remainder of the trial, defense counsel would report to the court each day that Carter still did not want to attend trial. Carter wanted to be in court for the closing arguments in the trial phase, but only if he could be unshackled, which one of his attorneys refused to consent to. Carter also absented himself from the penalty-phase proceedings.

*Id.* at 356 n.3, 734 N.E.2d at 605 n.3.

The Ohio Court of Appeals provided this account of Carter's pre-trial competency hearings:

> On December 26, 1997, the trial court held a hearing to determine if appellant was competent to stand trial. At that hearing, Dr. Stanley Palumbo was called by the state. He testified that he met with appellant twice. He reviewed the police records in the case, custody records, and administered an intelligence test. The test revealed that appellant had an IQ between seventy and eighty, but Dr. Palumbo believed appellant was not trying because he had taken a previous test where he had scored ninety. Appellant would often answer "I don't know" rather than trying to answer questions correctly. He diagnosed appellant with an antisocial personality disorder, but did not believe he had a mental illness. He believed appellant was competent to stand trial because he understood the proceedings, everybody's role in the proceedings, and that he was facing the death penalty. On cross-examination, appellant's attorneys questioned Dr. Palumbo extensively about appellant's social and medical history, which included seizures, hearing loss, and possible brain damage caused by a high fever.

Appellant called Deputy Darby Vaughn who testified that appellant had attempted suicide and attacked other prisoners while in jail, awaiting trial. Appellant's counsel requested funds for an MRI test and for a second expert, which the trial court denied. The trial court ruled that appellant was competent to stand trial and indicated that it did not believe that it was even a close question.

On February 26, 1998, during jury selection, the trial court held a second hearing to determine whether appellant was competent to stand trial. At that hearing, appellant called Dr. Stephen A. King who testified that, although appellant understood the proceedings, he had some sort of paranoia that prevented him from trusting and aiding his attorneys. Dr. Palumbo testified that he met with appellant two more times and determined that he wanted to plead guilty and was angry at his attorneys for insisting he go to trial.  The state called Dr. Robert W. Alcorn who testified that appellant suffered from an antisocial personality disorder and had abused drugs in the past, but felt that he was "malingering" and not really mentally ill. The trial court again ruled that appellant was competent to stand trial.

*Carter*, 2000 Ohio App. LEXIS 5935, at **11–13.

**1.      Trial-Court Error**

Carter claims that the trial court failed to protect his constitutional right to competency in several respects.  The Ohio Supreme Court was the last state court to provide a reasoned opinion on these claims.  It found that "[s]ome evidence indicates that while awaiting trial, Carter attempted suicide. Otherwise, his unwillingness to attend the court proceedings and sometimes apparent disagreements with counsel were the only indications in the record that raised a question of competence to stand trial."  *Carter*, 89 Ohio St. 3d at 605, 734 N.E.2d at 356.  The court concluded, "Carter asks this court to disregard the opinions of the experts. A review of the proceedings does not warrant that action. . . .  The trial court's findings of fact fail to support Carter's claim that the court's decision was unreasonable, arbitrary, or unconscionable." *Id.* Although Carter does not address the AEDPA standards of review governing these claims, his claims challenge the Ohio court's decision as both an unreasonable application of clearly

(3:02CV524)                                                                                          35

established federal law under § 2254(d)(1), and an unreasonable determination of the facts under

§ 2254(d)(2).

### a.    Failure to Consider Relevant Information

Carter first argues that the trial court failed to consider two pieces of evidence:  a

psychosocial history written by psychiatric social worker Albert Linder and a letter written by

psychologist Dr. Douglas Darnall to defense counsel.  ECF No. 129 at 8–9; ECF No. 226 at 18.

A state court's competency determination is treated as a question of fact under AEDPA's

§ 2254(d)(2).  *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *see also Filiaggi v. Bagley*, 445

F.3d 851, 858-59 (6th Cir. 2006) (a determination of competence is a factual finding, to which

deference must be paid and a petitioner must rebut with clear and convincing evidence under

AEPDA §§ 2254(d)(2) and (e)(1)).  The Supreme Court has explained that the competency issue

"encompass[es] more than 'basic, primary, or historical facts,' [its] resolution depends heavily on

the trial court's appraisal of witness credibility and demeanor. . . .  [A] trial court is better

positioned to make decisions of this genre, and [the Court] has therefore accorded the judgment

of the jurist-observer 'presumptive weight.'" *Thompson*, 516 U.S. at 111 (citations omitted).

The State attacks the weight of the evidence Carter contends the trial court should have

reviewed, arguing that the trial court "considered all relevant information in considering Carter's

competency." ECF No. 138 at 36–38.  But that is of no consequence.  Carter acknowledges that

the report and letter "were never presented to the trial court and were not considered by the

experts who testified that Sean Carter was competent to stand trial." ECF No. 129 at 9.  A trial

court cannot commit constitutional error by not considering evidence it was never given.

Moreover, as the State points out, the Court may not consider evidence outside the state-court record. *Pinholster*, 131 S. Ct. at 1398. Indeed, the documents Carter identifies are not even in the Court's record. The Court denied Carter's request to expand the record in this case to include this evidence because Carter did not demonstrate that he was diligent in presenting it to the state court as required by § 2254(e)(2). ECF No. 139 at 8–9. This claim is meritless.

### b.    Reliance on Flawed Expert Testimony

Carter next claims that the trial court erred by relying on the "flawed" evaluations and testimony of the court-appointed expert, Dr. Palumbo, and State expert, Dr. Alcorn, in finding that Carter was competent to stand trial. ECF No. 129 at 9–13. Specifically, Carter complains that Dr. Palumbo failed to further investigate statements Carter made about his inappropriate laughing and suicidal thoughts; "question[ed] the legitimacy" of Carter's reported hallucinations, which were documented in multiple sources; failed to contact corrections officers to investigate Carter's "persecutory and paranoid complaints" about his lawyers; failed to discuss the severity and nature of Carter's mother's schizophrenia; did not appear to know that an aunt and uncle of Carter's also had been diagnosed with schizophrenia; and discounted "strong" evidence of clinical depression. ECF No. 129 at 9–10. As to Dr. Alcorn, Carter argues that he also failed to consult with jail personnel; made inaccurate statements "reflective of his cursory and inaccurate history and review of collateral records"; failed to make clear the relationship between Carter's mental illness and substance abuse; reported that he observed Carter to be actively hallucinating, yet dismissed this potentially psychotic phenomenon as not being genuine; failed to inquire more deeply into Carter's disorganized and confusing speech and sequential reasoning abilities; and mischaracterized Carter as an antisocial personality with substance abuse problems rather than

(3:02CV524)                                                                                         37

having a "bona fide severe mental illness," or psychosis, which "would have made more sense"

given Carter's "signs and symptoms," such as his remorse over the murder, "want[ing]" the death

penalty, and hostility toward his attorneys and others.  *Id.* at 11–12.  Carter supports his

allegations with an affidavit of an expert he retained in these federal habeas proceedings, which,

again, the Court may not consider.

      Carter's claim misses the mark.  As the State argues, the issue here is not whether Drs.

Palumbo and Alcorn were adequately prepared or persuasive.  The issue is whether the Ohio

Supreme Court decision affirming the trial court's determination of Carter's competency was

reasonable in light of the evidence presented.  Carter faults the experts' methodology and

conclusions, but he has not rebutted by clear and convincing evidence one factual finding

underlying the Ohio Supreme Court's decision.

      The Ohio high court acknowledged that there was some evidence calling into question

Carter's competency to stand trial—namely, his suicide attempt, unwillingness to attend the court

proceedings, and apparent disagreements with counsel.  *Carter*, 89 Ohio St. 3d at 605, 734

N.E.2d at 356.  But it correctly concluded that, in light of the proceedings as a whole, it could not

"disregard the opinions of the experts."  *Id.*

      As the state court explained, the trial court was sharply attentive to, and fully informed

about, Carter's competency.  It appointed its own expert, Dr. Palumbo, and authorized funding

for Carter's expert, Dr. King.  The State also retained an expert, Dr. Alcorn.  These experts

evaluated Carter at length.  The court then conducted two competency hearings, at which the

(3:02CV524)                                                                                      38

experts testified and numerous exhibits were introduced.[9]  Two of the experts, Drs. Palumbo and

Alcorn, found Carter competent to stand trial.  Carter's counsel had every opportunity to expose

weaknesses in their investigation, evaluations and opinions through cross-examination and Dr.

King's testimony.  As the court further noted, even Dr. King admitted on cross-examination that

the question of Carter's competency was "a close call, this is a subtle case."  Trial Tr. vol. VI at

591.

        Given the careful and thorough nature of these proceedings, Carter "has not shown that

the trial court was *clearly* wrong in believing the State's expert."  *Franklin v. Bradshaw*, 695

F.3d 439, 449 (6th Cir. 2012) (rejecting habeas petitioner's competency claim); *see also Hall v.

Florida*, 134 S. Ct. 1986, 1993 (2014) (emphasizing the critical role the medical community and

its clinical standards play in defining and determining intellectual disability when considering

eligibility for the death penalty); *O'Neal v. Bagley*, 743 F.3d 1010, 1022–23 (6th Cir. 2013) ("For

better or worse, as a habeas court, we are not in a position to pick and choose which evidence we

think is best so long as the presumption of correctness remains unrebutted. . . . With expert

testimony split, as it often is, the state court chose to credit [the two experts] over [petitioner's

expert], and we cannot say from this vantage that it was unreasonable to do so.").  Accordingly,

_____

        [9]  At the first hearing, the State introduced Dr. Palumbo's competency evaluation
as an exhibit.  Trial Tr. vol. I at 18.  At the second hearing, the State introduced the
following exhibits: a 1995 Portage County Department of Youth Services evaluation and
social history; and Dr. Alcorn's resume and two letters to the prosecutor stating his
findings and opinion regarding Carter's competency.  Trial Tr. vol. VI at 589, 606, 781,
783, 789.  And the defense introduced the following exhibits: Dr. King's competency
report and curriculum vitae; and two letters written in1984 from the Trumbull County
Mental Health Center regarding Carter's mother's and uncle's schizophrenia.  *Id.* at 556,
562.

the judgment of the Ohio Supreme Court in affirming the trial court's determination of Carter's

competency was not unreasonable, or "beyond any possibility for fairminded disagreement."

*Harrington*, 562 U.S. at 103.

c.      **Failure to Raise the Competency and Presence Issues
during the Trial**

Carter further argues that the trial court erred by failing to "inquire" further into Carter's

competency or "ability to be present" once the trial began.  ECF No. 129 at 13–17.  In affirming

the trial court's determination of Carter's competency, the Ohio Supreme Court did not directly

address the fact that the trial court did not revisit the issue of Carter's competency after the

second competency hearing.  *Carter*, 89 Ohio St. 3d at 605, 734 N.E.2d at 356.  And, although

the state court found that Carter's refusal to attend his trial was a possible indication of

incompetency, it expressed no disapproval of the trial court's handling of the matter.  *See id.* at

356 n.3, 734 N.E.2d at 605 n.3.  Nevertheless, the court's summary disposition of this claim

constitutes an adjudication on the merits for AEDPA purposes, *Harrington*, 562 U.S. at 99, and,

as an issue of law, must be reviewed under AEDPA's unreasonable-application prong, §

2254(d)(1).  *See, e.g., Lewis v. Robinson*, 67 F. App'x 914, 921–22 (6th Cir. 2003).

The Supreme Court has advised that "[e]ven when a defendant is competent at the

commencement of his trial, a trial court must always be alert to circumstances suggesting a

change that would render the accused unable to meet the standards of competence to stand trial."

*Drope*, 420 U.S. at 181.  The Court has never "prescribe[d] a general standard with respect to the

nature or quantum of evidence necessary to require resort to an adequate procedure" for

determining competency.  *Id.* at 172.  Nevertheless, it has explained,

evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

*Id.* at 180; *see also Robinson*, 383 U.S. at 385 ("Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial," a trial judge has the duty to order a hearing *sua sponte*).

Carter identifies only one factor that should have prompted the trial court to inquire further into the issue of his competency once the trial began: Carter's absence from trial. Carter claims that the trial court had an obligation to "bring [him] back into the courtroom to question him as to his desire to be present, or to put on the record Sean's understanding of the proceedings." ECF No. 129 at 14 (emphasis omitted).

The Supreme Court long has recognized that "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause [of the Sixth Amendment] is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970) (citing *Lewis v. United States*, 146 U.S. 370 (1892)). The Court has held, however, that a defendant may lose his right to be present at trial if, after a judge warns him that he will be removed if he continues his disruptive behavior, he still acts in a manner "so disorderly, disruptive, and disrespectful of the court" that the trial cannot continue with him in the courtroom. *Id.* at 343. The right to be present can be reclaimed, however, if the defendant is

willing to conduct himself "consistently with the decorum and respect inherent in the concept of

courts and judicial proceedings." *Id.*

> A defendant's competency and presence at trial are related.  The Court has explained,
>
> Petitioner's absence bears on the analysis in two ways:  first, it was due to an act which suggests a rather substantial degree of mental instability contemporaneous with the trial . . . ; second, as a result of petitioner's absence the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him.

*Drope*, 420 U.S. at 180–81 (citation omitted).

A review of the record demonstrates that the trial court took every reasonable and

appropriate step to protect Carter's right to be present at his trial.  The judge was careful to

ensure that any waiver of that right was intelligent and voluntary in a lengthy colloquy in his

chambers.  He informed Carter of the importance of being present at trial, telling him, "I want to

inform you that you have an absolute right to be at the trial.  It's a very important thing that's

being done and the [C]onstitution guarantees you the right to be here . . . ."  Trial Tr. vol. XII at

2274.  The judge also repeatedly pressed Carter to state affirmatively his desire to be absent from

the courtroom during his trial.  He said, for example, "So if I do decide to grant your request to

not be here while you're being tried, . . . you're going to have to tell me on the record that that's

what you want to do even though it would most likely hurt your case; do you understand that?"

*Id.* at 2275.

The judge tried to put off making a decision regarding Carter's request until he had had

time to research the issue.  *Id.*  But Carter repeatedly and emphatically told the judge he would

not return to the courtroom.  *See id*. ("That's what I want to do."); *id*. at 2276 ("I don't want to be

here at the trial. . . .  I don't want to. . . .  I still don't want to, though. . . .  I still don't want to.").

(3:02CV524)                                                                                    42

Eventually, Carter left the judge no choice but to remove him from the courtroom.  The

following dialogue took place:

| The Defendant: | . . . But I, I don't know.  I don't want to be here, don't want to be over in the court.  Like, if I act up in here or something, like get restrained, they take me over there if I did that? |
| --- | --- |
| The Court: | Again, I'm going to tell you, don't act up in court because then I would have to give you penalties for that, and I don't want to have to do that. |
| The Defendant: | Because I have more time or something?  Is that more time or something? |
| The Court: | Yes. |
| The Defendant: | More time, that ain't nothing. |
| The Court: | It could – |
| The Defendant: | That ain't nothing. |
| The Court: | The point is, I'm going to take your request that you have given to me seriously. |
| The Defendant: | I ain't going over there, though. |
| The Court: | Hold on.  I'm going to take your request seriously, to decide whether or not you can be tried without your presence, but I'm not going to get that until tomorrow.  So I want you now to sit here in from of this jury and not act up.  Can you do that for me? |
| The Defendant: | Yeah.  But I, I don't want to. |
| The Court: | But will you do that for me today? |
| The Defendant: | No. |
| The Court: | No?  You're going to act up, is that what you're telling me? |
| The Defendant: | Uh-huh. |
| The Court: | Okay.  Why don't you have a seat outside. |

(3:02CV524)                                                                                          43

|                  |                                              |
|------------------|----------------------------------------------|
| The Defendant:   | Who?                                         |
| The Court:       | You.                                         |
| The Defendant:   | Over there?                                  |
| The Court:       | Take him back in the courtroom for now.      |
| The Defendant:   | I ain't going over there.                    |

*Id.* at 2279–81

At that point, as the judge described it on the record,

What happened is basically the Defendant lost complete control, indicated to the Court that he would act up and, in fact, proceeded to jump around, went crazy[,] causing the deputies, four deputies[,] to restrain him and put him in leg irons. And he struggled very violently with them.  And he has promised to the Court that he intends to continue that type of activity throughout the trial if he's required to be here.

*Id.* at 2281–82.

The judge then took appropriate measures to ensure that Carter could watch the trial on a television monitor from a separate jury room and contact his attorneys if necessary.  *Id.* at 2283. He also asked defense counsel to inform him if Carter would like to return to the courtroom and agree not to disrupt the proceedings.  *Id.* at 2284.  Finally, he gave the jury a cautionary instruction to disregard Carter's absence from the courtroom.  *Id.* at 2290.  Carter's counsel apprised the court throughout the trial of Carter's continued wish to remain outside the courtroom.  *Id.* at 2535; Trial Tr. vol. XIII at 2573; Trial Tr. vol. XIV at 2691, 2808; Trial Tr. vol. XV at 3000; Trial Tr. vol. XVI at 3251.

Near the end of the guilt phase of Carter's trial, Carter's counsel informed the court that Carter now wished to be present in the courtroom and would promise not to be disruptive—but

(3:02CV524)                                                                                                    44

only on the condition that he be unshackled.  The deputies did not think they could protect both

of Carter's attorneys if Carter was unshackled, however, and one of the defense counsel, whom

Carter had threatened to kill, would not waive that protection.  The judge decided he would have

to remain shackled.  When advised of this, Carter chose to stay in the jury room.  Trial Tr. vol.

XV at 3094–97.  The prosecutor noted on the record that Carter's "behavior has been very

impulsive and he has acted up.  We've heard him.  People have complained that he's hollered in

the back . . . ."  *Id.* at 3097.  The judge summed up,

> I have to balance [Carter's] Constitutional [r]ights against the protection of
> everyone that's in the courtroom. . . .
>
>          . . . I think on balancing the whole situation I would allow him his
> Constitutional [r]ight to be present, but with shackles.
>
>          Now having said that, it's my understanding that he does not wish to
> appear . . . .

*Id.* at 3098.

It is clear from this account that the trial court was patient, solicitous, and wholly

reasonable in its treatment of Carter's presence in the courtroom.  It also is clear that Carter

expressly, voluntarily and intelligently waived his right to be present, both through his oral

statements and his disruptive behavior, and continued to express that desire throughout the trial.

Carter's conduct was not "beyond his rational control," as Carter suggests, ECF No. 129 at 17,

but entirely rational.  He clearly expressed his wish not to be present, thought of a way to make

that happen (by "acting up"), asked about possible consequences for that conduct, and, after

dismissing those consequences, lunged at the judge.  He received that which he sought: removal

from the courtroom.  Later, when he agreed to return to the courtroom, he unreasonably

conditioned his acquiescence on being unshackled and withdrew his agreement when his request

was denied.

In sum, Carter's claim that the trial court erred by not "inquir[ing]" further into his

absence is belied by the record.  The trial court did indeed monitor the situation throughout

Carter's trial, albeit through his counsel.  And Carter points to nothing in the record that shows

the judge should have done something more, or that even if the judge had questioned Carter

directly, the result would have been any different.  Accordingly, the Ohio Supreme Court neither

contravened nor misapplied clearly established Supreme Court precedent in concluding that the

trial court did not violate Carter's due process rights by not inquiring further into his competency

and removing him from the courtroom during his trial.

### d.  Failure to Obtain Carter's Waiver of Presence at the Sentencing Phase of Trial

Carter further maintains that the trial court should have obtained from Carter an express

waiver of his right to be present before the sentencing phase of the trial.  ECF No. 129 at 17–19.

He relies on Supreme Court authority for the proposition that a constitutional right must be

"knowingly and voluntarily waived . . . ."  *Id.* at 17–18 (citing *Miranda v. Arizona*, 384 U.S. 436,

444 (1966) and *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

This claim, too, is meritless.  As noted above, just minutes into his trial, Carter

voluntarily and unequivocally waived his right to be present in the courtroom.  Carter cites no

clearly established Supreme Court precedent requiring a second express waiver from a defendant

before the sentencing phase of trial begins under these circumstances.  Additionally, Carter's

behavior in the courtroom and outside, in the presence of the trial judge, along with his

communications to the trial judge certainly support a reasonably inferred continuation of that

(3:02CV524)                                                                                              46

earlier made knowing and voluntary waiver of his right to be present in the courtroom during the

sentencing phase.

**2.        Ineffective Assistance of Counsel**

Carter also argues that his trial counsel provided ineffective assistance when they "failed

to vigorously pursue the issue of his competence throughout the proceedings." ECF No. 129 at

38. The last state court to provide a reasoned decision on Carter's competency ineffective-

assistance claims was the Ohio Court of Appeals. It stated,

> Appellant asserts that his attorneys failed to develop a complete record to
> show that he was incompetent to stand trial because his paranoid personality did
> not permit him to trust, or therefore consult with and aid, his lawyers. As evidence
> of that claim, appellant submits an affidavit from his trial attorney to attest to the
> following facts: appellant would not cooperate with his attorneys; appellant would
> not discuss any aspects of the case or his personal life with his attorneys; appellant
> stood and told the jury not to waste their time with the trial because he was guilty;
> appellant wanted to kill his attorney; both appellant's mother and uncle were
> paranoid schizophrenics; and appellant would only come out of the jury room
> during trial if his attorneys bribed him with candy. The record also shows that
> appellant told the court that he did not want to be present during the trial, just
> wanted to plead guilty, and he attempted to attack the court.

*Carter*, 2000 Ohio App. LEXIS 5935, at **10–11. After describing the hearings, as quoted

above, the court concluded that Carter's

> inability or unwillingness to aid his attorneys in the defense of his case is
> well-documented in the record. Neither his petition for postconviction relief nor
> his brief raise new grounds or point to anything outside the record to demonstrate
> that he is entitled to relief or a hearing.

*Id.* at *13.

The Supreme Court long has recognized that the Sixth Amendment right to the effective

assistance of counsel at trial "is a bedrock principle in our justice system." *Martinez v. Ryan*,

132 S. Ct. 1309, 1317 (2012); *see also Gideon v. Wainwright*, 372 U.S. 335, 342–44 (1963). The

(3:02CV524)                                                                                     47

Court announced a two-prong test for claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness." *Id.* at 688. It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* at 693 (citation omitted). Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.* Ineffective-assistance claims are mixed questions of law and fact. *Id.* at 698. Habeas courts review such claims, therefore, under AEDPA's "unreasonable application" prong, § 2254(d)(1). *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 737–38 (6th Cir. 2003).

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington,* 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356. 371 (2010)). It has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id*. (internal quotation marks and citations omitted).  Thus, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ."  *Strickland,* 466 U.S. at 689.  "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'"  *Pinholster*, 131 at 1406-07 (quoting *Strickland,* 466 U.S. at 689–90).

The Court has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so."  *Harrington,* 562 U.S. at 105 (internal quotation marks and citations omitted).  It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.*

### a.  Failure to Prepare Experts for, and Present Material Evidence at, the Competency Hearings

Carter argues that the state court's decision was contrary to, or an unreasonable application of, *Strickland* given his trial counsel's failure to provide to the experts, or present to

the trial court, material evidence of his incompetency to stand trial.  ECF No. 129 at 8–9, 38–39;

ECF No. 226 at 16–19, 71.  The Court disagrees.

### (1)       Additional Evidence of Incompetency

Carter most emphatically complains that his trial counsel did not present to his expert or

the trial court the following records:  the psychosocial history written by Albert Linder and  letter

Dr. Darnall wrote to defense counsel, discussed above; the affidavit of Ida Magee, Carter's foster

mother; a 1994 chemical dependency assessment from the Portage County Juvenile Court

Substance Abuse Awareness Department; and 1995 evaluation of the Portage-Geauga County

Juvenile Detention Center.  ECF No. 129 at 8–9; ECF No. 226 at 16–19.

The Court may not consider this evidence as it was not part of the state-court record.

Moreover, Carter offers nothing more than conclusory allegations about his counsel's failure to

give these particular documents, and other, unspecified "records of Sean's history," to Dr. King.

There is nothing in the record to show what documents counsel actually possessed, or what

documents they, or Dr. King himself, may have decided for strategic reasons to use in

preparation of the competency evaluation or as evidence at the competency hearings.  The record

does show, however, that Dr King—like Drs. Palumbo and Alcorn—reviewed numerous

informative documents in connection with his assessments of Carter's competency, presumably

containing similar, if not identical, information to the documents to which Carter refers.[10]

_____

[10]  Dr. King's report includes as "sources of information": Dr. Palumbo's
competency evaluation, a social history prepared by a probations officer of the Portage
County Department of Youth Services; a 1995 report prepared by the Portage County
Juvenile Court Psychology Department; and an affidavit of an officer of the Trumbull
County Sheriff's Department prepared in September1997; and Carter's statement to the
police after he was detained.  ECF No. 88 at 31–32 (the State did not include pre-trial and

(continued...)

### (2)     Attorneys' Testimony at Hearings

Carter also argues that his trial counsel should have testified at the two competency hearings about Carter's hostility toward them and refusal to assist in preparing his defense.  ECF No. 129 at 38.  Testifying, however, would have posed serious ethical concerns, possibly resulting in the disclosure of confidential or privileged information or the attorneys' disqualification from the case.  *See* Ohio R. Prof. Conduct 1.6, 3.7.  Moreover, Carter's attorneys did not need to testify themselves to make their difficulties in representing Carter clear to the court; they could do so effectively through questioning witnesses and their expert's testimony. One example is this exchange between defense counsel and Dr. Palumbo at the first competency hearing:

> Q:     Now, he told you he doesn't like lawyers.  Isn't that a form of paranoia?
>
> A:     It may be, but I don't believe it is in this case.
>
> Q:     Why would this case be any different?
>
> A:     Because I've evaluated many individuals that have had difficulty with the law and I would say that most of them feel the same way, would not trust attorneys.  That's a common statement.
> . . .

---

[10](...continued)
trial exhibits in the appendix to the return of writ; instead, it later moved to expand the record to include them, which the Court granted.  *See* ECF Nos. 81, 84, 85–89.).  Dr. Palumbo, in turn, relied upon "a number of materials," including school and "Children's Services Board" records, and statements of Carter and "other family members and . . . individuals."  Trial Tr. vol. I at 10 (the Court could not find in the record Dr. Palumbo's report, which presumably contained a more comprehensive list of sources).  Dr. Alcorn reviewed similar documents, including Dr. Palumbo's evaluation, Carter's statements to police, an Ohio Bureau of Criminal Investigation report, 34 pages of Carter's letters and drawings, statements of relatives of Veader Prince and other witnesses; and more than 200 pages of records from an Ohio county children services board.  Trial Tr. vol. VI at 784–85; ECF No. 88 at 22–23.

(3:02CV524)                                                                              51

> Q:     In this case already Mr. Carter has not listened to his attorneys' advice.
>        We have asked to have the matter continued to prepare better for it.
>
> A:     I don't know. Is that the case? I don't know.
>
> Q:     Yeah, that's the case. Does that not show indication that he doesn't want
>        to listen to his attorneys' advice?
>
> A:     Excuse me. It certainly sounds like he doesn't want to, but that's different
>        from being able to.
>
> Q:     You are mixing up what he is able to do and tendencies of paranoia. I'm
>        not asking what he is able to do, I'm saying does that not exhibit a sign of
>        paranoia when somebody gives you sound advice and you just don't trust
>        them so you won't listen to them.
>
> A:     It may.
>
> Q:     Do you feel that he is able to aid in his own defense?
>
> A      Yes, sir.

Trial Tr. vol. I at 36–38. And Dr. King testified at the second competency hearing,

> I've had conversations with his counsel as frequent as today and they have
> indicated to me that he is uncooperative with them, he is not working with them,
> that actually he is very hostile when put under any pressure, and that they are
> actually not only apprehensive but even afraid of him.

Trial Tr. vol. VI at 568. The attorneys' testimony, therefore, would have been merely cumulative

to what already was in the record.

### (3)     Evidence of Mental Illness

Carter further argues that his counsel failed to present evidence of his "severe mental

illness" and "bizarre" behavior. ECF No. 129 at 8, 38. The record belies this claim. Carter's

counsel thoroughly examined each of the experts about aspects of Carter's social and medical

history that indicated mental illness, including seizures, hearing loss, learning disabilities, and

(3:02CV524)                                                                                                    52

possible brain damage and hallucinations.  *See, e.g.*, Trial Tr. vol. I at 27–29, 90–92; Trial Tr.

vol. VI at 564–69, 726.  In particular, counsel presented Deputy Vaughn to testify at the first

competency hearing that Carter had attempted suicide and acted aggressively toward others.

Trial Tr. vol. I at 96–98.  At the second hearing, they presented Dr. King, who testified that

Carter exhibited bizarre behavior during his evaluations, such as laughing about his case and

stating that he wanted to kill Attorney Consoldane.  Trial Tr. vol. VI at 558–59.  Carter's counsel

also questioned the experts at both hearings about the significance of the fact that Carter's mother

and maternal uncle were schizophrenic.  Trial Tr. vol. I at 29–31; Trial Tr. vol. VI at 563–64,

731–34.  And Attorney Lewis aggressively cross-examined Dr. Alcorn about the nature of

Carter's hallucinations.  Tr. vol. VI at 824–36.[11]

### (4)  Neuropsychological Examination

Finally, Carter argues that counsel was ineffective because they "did not request a

neuropsychological examination."  ECF No. 129 at 39.  At the end of the first competency

hearing, defense counsel requested funds for an MRI and expert to examine Carter for brain

_____

[11]  Carter asserts that his trial counsel did not effectively cross-examine Drs.
Palumbo and Alcorn "to reveal the inconsistencies and inadequacies of their testimony,
for example the failure to review all records and to interview collateral sources."  ECF
No. 129 at 39.  But he does not cite to one example in the trial transcript in which
counsel's cross-examination was deficient.  Nor does he show "a reasonable probability
that . . . the result of the proceeding would have been different" had counsel cross-
examined the experts differently.  *Strickland*, 466 U.S. at 694.  The Court, therefore, will
not address this claim.  *See, e.g., United States v. Crosgrove*, 637 F.3d 646, 663 (6th Cir.
2011) ("Because there is no developed argumentation in these claims, the panel declines
to address [the defendant's] general assertions of misconduct in witness questioning and
closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008)
("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at
developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440
F.3d 832, 846 (6th Cir. 2006)).

defects, based on Dr. Palumbo's testimony about Carter's seizures, learning disability, and

hearing loss.  Trial Tr. vol. I at 98–99.  The trial court, having found Carter competent, denied

the motion for a second expert, but reserved ruling on the MRI in the event it became relevant

later for another purpose.  *Id*. at 100–01.  At the second competency hearing, Dr. King testified

that it would be "comprehensive" to conduct an MRI test.  The trial court then directly

questioned Dr. King about the necessity for an MRI in this exchange:

> The Court:      Do you need [an MRI] for any of your opinions, doctor?
>
> A:      No.
>
> The Court:      Well, then why do you suggest that he should?
>
> A:      Well, what I'm saying is that it would add to a comprehensive workup.
> I'm not saying that it's necessary for me to make the diagnosis or render
> my opinion in this case.
>
> The Court:      And I appreciate what you're saying but—of course I would be
> glad to order it if it would be helpful in some area, but if it's not
> going to be.  You don't need it for your opinions, correct?
>
> A:      No.  No, I don't.
>
> The Court:      Then can you tell me why it would be necessary for this case or to
> assist Mr. Consoldane?
>
> A:      Well, Mr. Consoldane I think is implying that it would be helpful.  I don't
> think he said it was necessary, so I think—
>
> Q:      Well, let me ask it to you this way, would it be helpful to know this in
> treating him to make him competent to be able to stand trial?
>
> A:      No.
>
> Q:      No.
>
> A:      No, I don't think so.
>
> . . .

> The Court:  But in your opinion an MRI would not assist us in this case to render any psychological opinions involving either sanity or competency or mental defect?
>
> A:  No.

Trial Tr. vol. VI at 564–66.  At the end of the hearing, the judge stated that he would authorize an MRI for purposes of the mitigation phase of trial, but defense counsel explained that he had requested the test for competency alone and declined the court's offer of an MRI "unless we can find some other organic evidence that would substantiate that."  Trial Tr. vol. VII at 869–70.

Given the opinion of the defense's own expert, Dr. King, that an MRI would be *useful* for purposes of a comprehensive psychiatric evaluation, but was not *necessary* for his evaluation of Carter's competency, Carter has not "overcome the presumption that, under the circumstances," not pursuing neurological testing or an MRI "was sound trial strategy."  *Strickland*, 466 U.S. 689. *See also Morris v. Carpenter*, Nos. 11-6322/6323, 2015 WL 5573671, at *15 (6th Cir. Sept. 23, 2015) ("Attorneys are entitled to rely on the opinions and conclusions of mental-health experts.") (citing *McGuire v. Warden, Chillicothe Corr. Inst*., 738 F.3d 741, 758 (6th Cir. 2013); *Black v. Bell*, 664 F.3d 81, 104–05 (6th Cir. 2011)).

Accordingly, the Ohio appellate court reasonably applied *Strickland* in concluding that his trial counsel did not perform deficiently in their preparation for, and presentation of evidence at, Carter's competency hearings.

### b.    Failure to Request a Third Competency Hearing and Preserve an Adequate Record for Appeal Regarding Carter's Incompetence

Carter also complains that the state court was unreasonable in finding no deficiencies in his trial counsel's treatment of the competency issue after the trial began.  ECF No. 129 at 14–15;

(3:02CV524)                                                                                                    55

ECF No. 226 at 71.  As with the trial court, however, Carter fails to point to evidence that should

have prompted defense counsel to request a third competency hearing.  Furthermore, throughout

the trial, counsel ensured that the record documented Carter's violent behavior in the courtroom,

his refusal to attend the proceedings, and his desire to kill Attorney Consoldane.  *See, e.g.*, Trial

Tr. vol. XI at 2281; Trial Tr. vol. XIII at 2573; Trial Tr. vol. XV at 3094–99.  This claim also

fails.

**II.      Second and Fifth Grounds for Relief: *Ineffective Assistance of Counsel***

        For his second and fifth grounds for relief, Carter alleges additional instances in which his

trial counsel breached his Sixth Amendment right to effective assistance of counsel.  He

complains that counsel:

    1.      Failed to investigate, prepare, and present mitigating evidence;

    2.      Failed to object to certain instances of prosecutorial misconduct**;**

    3.      Failed  "to present argument" concerning jury instructions on murder,
            manslaughter, theft, and gross sexual imposition, and the need for instructions on
            the lesser-included offenses of aggravated murder, aggravated robbery, and rape;
            and

    4.      "Negated" their own theory of the case during closing argument.[12]

ECF No. 129 at 21-34, 37-39.

---

        [12]  Carter added a fifth ineffective-assistance sub-claim in his traverse, regarding
his trial counsel's failure to "review" and "notice" the defective indictment.  The Court
will not address this claim, however, as a district court may decline to review a claim that
a party raises for the first time in his or her traverse.  *Tyler v. Mitchell*, 416 F.3d 500, 504
(6th Cir. 2005).

(3:02CV524)                                                                                              56

### A.    Procedural Posture

Carter raised the first sub-claim, as listed above, on post-conviction to the trial court and court of appeals, which adjudicated it on the merits.  *See Carter*, 2000 Ohio App. LEXIS 5935, at **8–10.  Carter also raised the claim on appeal to the Ohio Supreme Court, but the court declined jurisdiction.  *State v. Carter*, 91 Ohio St. 3d 1509, 746 N.E.2d 612 (Ohio 2001).  This claim, therefore, is preserved for federal habeas review.

The State argues that the second sub-claim, as listed above, is procedurally defaulted.  Carter did not raise it on direct appeal.  He did raise the claim on post-conviction, but the court denied it on the ground of *res judicata*, and Carter then failed to appeal that decision.  ECF No. 138 at 71 (citing App. vol. IV at 18–19, 90–91).  The Sixth Circuit consistently has recognized Ohio's doctrine of *res judicata,* barring courts from considering any issue that could have been, but was not, raised on direct appeal, as an "independent and adequate state ground" upon which to find a habeas claim procedurally defaulted.  *See, e.g., Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

Carter responds that he raised an ineffective-assistance claim regarding "some instances of prosecutorial misconduct" on direct appeal to the Ohio Supreme Court under his fifth proposition of law.  He also contends that he raised this claim in his application to reopen his direct appeal, or *Murnahan* application, and, because the Ohio Supreme Court denied the petition without asserting a procedural bar, the claims are not defaulted.  ECF No. 226 at 72–73.  *Murnahan* applications allows capital defendants to present claims of ineffective assistance of appellate counsel to the Ohio Supreme Court within a prescribed 90-day time period.  Ohio S. Ct.

(3:02CV524)                                                                                              57

Prac. R. 11.06(A) (this rule was designated as Ohio S. Ct. Prac. R. XI, § 5 when Carter filed his

application); *see also State v. Murnahan,* 63 Ohio St. 3d 60, 584 N.E.2d 1204 (Ohio 1992).

  This claim is procedurally defaulted.  Carter did not raise this claim on direct appeal.  *See*

App. vol. III at 137–42.  Nor did he raise the claim in his *Murnahan* application.  He mentioned

this ineffective-assistance-of-*trial*-counsel claim there only as the basis for his ineffective-

assistance-of-*appellate*-counsel claim; in other words, as a claim that his appellate counsel erred

for not having raised on direct appeal.  The claim, therefore, remains procedurally defaulted

absent a showing of cause and prejudice, which Carter does not make.  *Lott v. Coyle*, 261 F.3d

594, 611-12 (6th Cir. 2001).

  Carter raised the third sub-claim on direct appeal to the Ohio Supreme Court, which

considered the claim on the merits.  *See Carter*, 89 Ohio St. 3d at 606, 734 N.E.2d at 357.  This

claim is ripe for federal habeas review.

  The State argues that the fourth sub-claim also is procedurally defaulted because,

although the claim is based on the record, Carter failed to raise it on direct appeal.  ECF No. 138

at 79.  Carter neither acknowledges nor responds to this argument.  The State is correct.  In Ohio,

where a defendant's ineffective-assistance claim "could [have been] fairly determined without

examining evidence outside the record," and the defendant does not raise that claim on direct

appeal, the *res judicata* doctrine precludes post-conviction relief for that claim.  *State v. Cole*, 2

Ohio St. 3d 112, 113–14, 443 N.E.2d 169, 171 (Ohio 1982).  Carter, having failed to present this

record-based claim to state courts and having no remaining state-court remedies, has therefore

procedurally defaulted this claim.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

(3:02CV524)                                                                                    58

**B.     Merits**

**1.     Failure to Prepare for, and Present Evidence at, the Mitigation Phase of the Trial**

Carter complains in his second ground for relief that his trial counsel failed to investigate, prepare, and present mitigating evidence, including evidence regarding Carter's childhood trauma, neglect and developmental difficulties; his serious mental illness; his family history of serious mental illness; his neurological dysfunction; his polysubstance abuse; and the impact the structured environment of prison would have had on him.  ECF No. 129 at 21–34.

The last state court to rule on this claim was the Ohio Court of Appeals on post-conviction.  Carter submitted as support for this claim an affidavit from an attorney, Gerald Ingram, who averred that a mitigation specialist is "required" in capital cases, because criminal trial lawyers "are inadequate and incompetent to discover" mitigating evidence without such expert assistance.  App. vol. IV at 26–27.  The appellate court stated:

> Appellant argues that he was denied effective assistance of counsel because trial counsel did not properly prepare for the penalty phase of the trial. He asserts that the trial court could only resolve this claim through a hearing and reference to evidence outside the record. In his petition for postconviction relief, appellant points to two specific reasons for the ineffectiveness of counsel:
>
> > (A) failing to fully investigate petitioner's medical and social history; and
> > (B) failing to hire a mitigation expert to assist in discovery of relevant information.
>
> The trial court ruled that appellant did not show substantive grounds for relief or a hearing in his claim that his trial counsel failed to investigate his medical and social history or hire a mitigation expert. The trial court found that appellant's trial counsel did hire a mitigation expert. On October 22, 1997, the trial court allowed funds for the hiring of mitigation experts, Sandra and Donald McPherson.

> At the sentencing hearing, appellant called Nancy Dorian, a psychologist for the children's services board who dealt with appellant's placement in foster care. She testified that appellant was emotionally flat, had little warmth and nurturing as a small child, had difficulty adjusting, had an inability to get along with people and was "schizoid-prone." She testified about appellant's situation with his birth mother, who was diagnosed as a schizophrenic, who neglected him and his sister and on at least one occasion tied appellant to the leg of a couch. Appellant was placed with different families during his childhood.
>
> Sandra McPherson testified at the penalty phase of trial and the record shows that she had conducted a thorough review of appellant's medical and social history, about which she testified to the jury. She corroborated much of Nancy Dorian's testimony and presented the jury with greater detail about appellant's background. This background included a history of mental illness in his family, developmental problems, trouble he had expressing himself, and that he never learned the boundaries of acceptable behavior. She concluded that he was unable to develop a "normal" capacity to think and feel.
>
> It does not appear from reading the record that appellant's counsel performed inadequately at the mitigation phase of the trial. Appellant's assertion that his counsel failed to investigate his medical and social history or to hire a mitigation specialist is not supported by the record. Furthermore, appellant did not submit any evidentiary documents or point to any evidence outside of the record that would indicate that he was entitled to relief or a hearing on this claim.

*Carter*, 2000 Ohio App. LEXIS 5935, at **8–10.

The Supreme Court repeatedly has held that counsel in capital cases have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Williams v. Taylor*, 529 U.S. 362, 396 (2000). In *Strickland*, the Court noted that a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" that counsel's role in the two proceedings is comparable: "to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland*, 466 U.S. at 686.

Accordingly, the Supreme Court and Sixth Circuit have found ineffective assistance of counsel in capital cases where trial counsel failed to adequately investigate or present mitigating

evidence at sentencing.  *See, e.g., Rompilla v. Beard,* 545 U.S. 374, 389–93 (2005) (counsel

ineffective for failing to examine court file of defendant's prior conviction which contained a

range of vital mitigation leads regarding defendant's childhood and mental health problems);

*Wiggins v. Smith*, 539 U.S. 510, 526, 534, 537 (2003) (counsel ineffective for failing to discover

and present "powerful" evidence of petitioner's "excruciating life history" and instead "put on a

halfhearted mitigation case"); *Frazier v. Huffman*, 343 F.3d 780, 795–99 (6th Cir. 2003) (counsel

ineffective for failing to introduce any mitigating evidence in either guilt or penalty phases of

trial when he was aware of petitioner's brain injury).

  Nevertheless, "the duty to investigate does not force defense lawyers to scour the globe

on the off chance something will turn up; reasonably diligent counsel may draw a line when they

have good reason to think further investigation would be a waste."  *Rompilla,* 545 U.S. at 383.

*See, e.g., Wiggins,* 539 U.S. at 525 (further investigation excusable when counsel has evidence

suggesting it would be fruitless); *Strickland,* 466 U.S. at 699 (counsel could "reasonably surmise

. . . that character and psychological evidence would be of little help"); *Burger v. Kemp*, 483 U.S.

776 (1987) (finding limited investigation reasonable because all witnesses brought to counsel's

attention provided predominantly harmful information).

  The Supreme Court has advised courts to "begin with the premise that 'under the

circumstances, the challenged action[s] might be considered sound trial strategy.'"  *Pinholster,*

131 S. Ct. at 1404 (quoting *Strickland,* 466 U.S. at 689).  Indeed, "strategic choices made after

thorough investigation of law and facts relevant to plausible options are virtually unchallengeable

. . . ." *Strickland,* 466 U.S. at 690.  Thus, the Court repeatedly has held that counsel is not

ineffective for deciding to offer little or no mitigating evidence where that decision is based on

(3:02CV524)                                                                                                    61

sound professional judgment.  *See*, *e.g.*, *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Strickland,* 466

U.S. at 699–700; *Burger,* 483 U.S. at 793-75; *Darden,* 477 U.S. at 184.

Courts may infer from the record a trial attorney's strategic basis for a challenged

decision.  The Supreme Court has explained,

> Although courts may not indulge "*post hoc* rationalization" for counsel's
> decisionmaking that contradicts the available evidence of counsel's actions, . . .
> neither may they insist counsel confirm every aspect of the strategic basis for his
> or her actions.  There is a "strong presumption" that counsel's attention to certain
> issues to the exclusion of others reflects trial tactics rather than "sheer neglect."

*Harrington*, 562 U.S. at 109 (citations omitted).

### a.       Investigation

Carter argues that the Ohio appellate court's conclusion that his "assertion that his

counsel failed to investigate his medical and social history . . . [was] not supported by the record"

contravenes or unreasonably applies Supreme Court precedent.  First, he generally complains that

his trial counsel "failed to investigate Mr. Carter's background for mitigating evidence."  ECF

No. 226 at 48.  But as the state court determined, the record contradicts this claim.  Just twelve

days after Carter was indicted, his counsel sought and received funding for an independent

psychologist, investigator, and mitigation specialist.  App. vol. I at 66–74; App. vol. II at 11–12.

Carter himself concedes that the experts gathered "crucial documents substantiating the facts of

[Carter's] traumatic childhood," including "a number of medical, legal, and social service

records" that were eventually admitted into evidence.  ECF No. 226 at 22–23.

More specifically, Carter claims his counsel or the experts they retained failed to uncover

in their investigation the Linder report and Darnall letter, described above, which he contends

document Carter's serious mental illness.  ECF No. 226 at 30–31.  But, again, the Court may not

consider this evidence.  *Pinholster*, 131 S. Ct. at 1398.

Carter also complains that his trial counsel "failed to investigate his history of drug

abuse," and cites to records that report his drug use and related criminal charges but were not

presented to the jury during mitigation.  ECF No. 226 at 43–44.  Again, Carter obtained some of

these records in federal habeas proceedings, such as a chemical dependency assessment of Carter

conducted for the Portage County Juvenile Court in April 1994 and pre-trial evaluations, and the

Court may not consider this evidence.  Another document to which he refers, "an evaluation"

conducted by the Portage County Department of Youth Services ("DYS") dated June 16, 1995, is

similar, if not identical to, a "social history" prepared by that agency, also dated June 16, 1995,

that was introduced at Carter's competency hearing and therefore clearly in his counsel's

possession.  *See* ECF No. 88 at 8–17.  In addition, another Portage County DYS evaluation of

Carter, dated June 15, 1995, which contains information about Carter's drug use, also was

introduced at the competency hearing.  *See* *id.* at 1–7.

Carter's more troubling complaint concerns counsel's failure to obtain neurological

testing for mitigation purposes.  ECF No. 226 at 34–43.  He argues that such testing would have

uncovered evidence of organic brain damage based on evidence in the record from his childhood,

including Carter's traumatic birth, drug use, withdrawn and anxious behavior, and history of

seizures.[13]  *Id.* at 34–35.

---

[13]  Carter also supports this argument with evidence obtained in discovery in these
habeas proceedings, which the Court may not consider.  *See* ECF No. 226 at 35-37.

As explained above, the trial court informed defense counsel after the first competency

hearing that he was inclined to authorize an MRI for mitigation purposes if they could "present

evidence of a particularized need."  Trial Tr. vol. I at 101.  At the second competency hearing,

Dr. King, the defense's expert, testified that an MRI would be "helpful" for a "comprehensive"

psychiatric evaluation of Carter.  Trial Tr. vol. VI at 568.  However, when the judge directly

asked Dr. King if "in [his] opinion an MRI would not assist us in this case to render any

psychological opinions involving either sanity or competency or mental defect[,]" Dr. King

replied, "No."  *Id.* at 566.  At a later pretrial hearing, the judge again asked defense counsel if

they would like to renew their motion requesting funds for an MRI, stating:

> The Court is mindful of the fact that mental defect and/or, just on a general
> basis as a mitigating factor, a mental condition could become important in this
> case should this case go to a second phase.  That being the case, and your expert
> saying he would like to see that, Dr. King, I will now allow you to do that. . . .  Do
> you wish to have that done?

Trial Tr. vol. VII at 870.  Attorney Consoldone replied that he "wanted that done for the

competency," but that he would decline the court's offer of funding for an MRI for mitigation

purposes "unless we can find some other organic evidence that would substantiate that."  *Id.*

Given Dr. King's express opinion that an MRI would *not* have advanced Carter's case for

mitigation, it is possible that Carter's trial counsel decided that, for sound strategic reasons, the

risk posed by an MRI was greater than its potential benefits: an MRI may have shown that Carter

had no brain defect at all and actually weakened Carter's position.  *See Morris v. Carpenter*, Nos.

11-6322/6323, 2015 WL 5573671, at *15 (6th Cir. Sept. 23, 2015) ("Attorneys are entitled to

rely on the opinions and conclusions of mental-health experts.") (citing *McGuire v. Warden,*

*Chillicothe Corr. Inst.*, 738 F.3d 741, 758 (6th Cir. 2013); *Black v. Bell*, 664 F.3d 81, 104–05

(3:02CV524)                                                                                              64

(6th Cir. 2011)).  Furthermore, the speculative nature of this claim precludes a showing of

prejudice; without knowing the results of an MRI test, Carter cannot demonstrate that his

counsel's decision to forgo the testing affected the outcome of the jury's sentencing.

        The Ohio appellate court, therefore, reasonably determined that Carter's trial counsel

were not constitutionally deficient in their efforts to prepare for the mitigation phase of trial.

### b.        Presentation of Evidence

        Carter also contends that the Ohio appellate court was unreasonable in deciding that his

trial counsel performed adequately during the mitigation phase of trial.  He argues that counsel

were ineffective in their "incomplete and inaccurate" presentation of evidence, focusing on three

aspects of their performance:  their cursory review of Carter's background and character; their

incoherent and damaging theory of mitigation; and their failure to introduce compelling

evidence.  *See* ECF No. 226 at 21–46.

### (1)        Cursory Review of Carter's Background and Character

        Carter complains generally that his counsel presented a "piecemeal," "haphazard," and

"cursory" overview of Carter's background and character to the jury.  *Id.* at 22, 29.  The record

clearly refutes this claim.

        Defense counsel presented two witnesses, Dr. Sandra McPherson, a psychologist and

mitigation specialist, and Nancy Dorian, a psychologist who oversaw Carter's family while

working for a social services agency, who together painted a detailed and balanced portrait of

Carter and his life.  Dr. McPherson in particular provided a comprehensive review of Carter's

family, academic, medical, psychological, and criminal history from his birth to the time of the

(3:02CV524)                                                                                      65

trial, as well as her assessment of his present psychological functioning.  *See, e.g.*, Trial Tr. vol. XVI at 3304–24.

Ms. Dorian's and Dr. McPherson's testimony was further supported by exhibits totaling hundreds of pages.  *See* ECF No. 89.  The State introduced Carter's Trumbull County Children Services case file, as well as school, medical, and juvenile court records.  Defense counsel introduced three reports from Ms. Dorian regarding psychological evaluations she had conducted of Carter in 1983, 1985, and 1986.  *See* ECF No. 89 at 1–4, 196–97; Trial Tr. vol. XVI at 3254–61.  They also introduced Dr. McPherson's report, which summarized the information contained in the other exhibits, as well as the reports of Drs. Darnall, Palumbo and Alcorn, and presented her psychological assessment of Carter and opinion of how his diagnostic status and functioning related to the crime.  *See* ECF No. 89 at 5–13; Trial Tr. vol. XVI at 3304, 3327.

### (2)  Incoherent and Damaging Theory of Mitigation

Carter also argues that his trial counsel lacked a "comprehensive and coherent theory of mitigation."  The jury, in his view, therefore "was unable to process, understand, or contextualize any of the evidence of Sean's traumatic background and mental illnesses . . . .  Instead, they were presented with an image of a mechanical killer who was unable to feel emotion, have empathy . . ., or express remorse."  ECF No. 226 at 20-21.  He cites to Dr. McPherson's diagnosis of Carter as a "psychopathic character," and her testimony that persons with this disorder

> are so severely disrupted that they simply do not feel or see or comprehend the world in the same way that we do, and he seems to fulfill many of those kinds of traits. . . .  He lacks an understanding of pain; he doesn't have the ability to know what other people are thinking, nor does he care; he's always alone . . . .

*Id.* at 22 (quoting Trial Tr. vol. XVI at 3318).  Carter further points to defense counsel's reference to him as a "piece of machinery" in his closing statement.  *Id.* (quoting Trial Tr.

(3:02CV524)                                                                                    66

XVI at 3369).  He suggests that his counsel should have focused instead on the impact a

structured prison environment could have had on him if he were given a life sentence.  *Id.* at 20–

21.

      The evidence and argument about which Carter complains, however, supported what was

a clear and well-developed theory of mitigation: that this young man committed a horrible crime

because he was severely psychologically damaged through no fault of his own and by

circumstances beyond his ability to control.  It was, in essence, a plea for mercy, rather than

Carter's proposed strategy of  minimizing his psychopathy while stressing his potential for

adapting well to prison life.

      Dr. McPherson's diagnosis of Carter as psychopathic was preceded by her detailed

account of Carter's traumatic first years of life, his early medical and mental illnesses, his

positive foster placement and later disruptive adoptions by the Smith and Carter families, his

troubled juvenile years, and his compromised intellectual functioning.  Trial Tr. Vol. XVI at

3304–15.  She stressed the negative impact his birth mother's neglect and the unsuccessful

adoptions had on every aspect of his development, including delayed cognitive development, a

seizure disorder, and attachment disorder as a young child, *id.* at 3305–06; inappropriate sexual

behavior and aggression as a juvenile, *id.* at 3310–11; and ultimately, mental illness.  She

testified, for example, that without proper nurturing children "don't develop adequately the

cognitive structures that underlie a lot of our thinking process.  In the same way, . . .[c]hildren

who are not loved don't develop the capacity to love or care for anybody, including themselves."

*Id.* at 3312–13.  She also explained his genetic predisposition to schizophrenic-like illnesses.  *Id.*

at 3316.

Carter focuses on Dr. McPherson's diagnosis and description of Carter's psychopathic features.  But Dr. McPherson diagnosed Carter with several psychological disorders, including adjustment disorder with depressed mood, multiple substance abuse, periodic psychotic episodes, possible emergence of schizophrenia, antisocial personality disorder, and borderline personality disorder.  *Id*. at 3315–20.  And defense counsel softened her testimony about Carter's psychopathic characteristics by eliciting Dr. McPherson's explanation that Carter's personality disorders were influenced by environmental, genetic,

and physiological factors beyond his control.  *Id*. at 3320–21.

Furthermore, defense counsel made their mitigation theory very clear to the jury.  In concluding Dr. McPherson's direct examination, counsel elicited her opinion that given his troubled childhood and developmental problems, Carter's foster placement was his "only chance" for a positive outcome, assuming he received substantial assistance such as psychotherapy and special education; instead, he was placed with two adoptive families who were not "reasonable placement[s]" and never received the help he needed.  *Id.* at 3321.  His final question highlighted Dr. McPherson's conclusion that Carter "was both born and made and neither of these processes were under his control."  *Id.* at 3323–24.

Counsel also reinforced their mitigation theory in closing argument.  For example, and to put the statement that Carter challenges in context, counsel argued:

> We come into this world, we can be anything, but that nurturing develops the feeling for empathy, for remorse, for feelings for others that's so important.. . . If you do without that you will have purely a piece of machinery.  You will have something that doesn't feel for other people, and that's the way it started out. That's the way Sean Carter came into this world. . . .  The question is what was going to happen down the road to change, . . . to get him to develop his relationships to care?

(3:02CV524)                                                                                                68

*Id.* at 3369.

Carter may now object to his counsel's mitigation theory and argue that another theory

would have been more successful, but, as the State asserts, that is precisely the type of second-

guessing of counsel's strategy that *Strickland* prohibits.  *See* ECF No. 138 at 90.  Keeping in

mind that in the mitigation phase of trial, "strategic choices made after thorough investigation . . .

are virtually unchallengeable," *Strickland,* 466 U.S. at 690, it is enough that "counsel presented a

theory of mitigation and provided evidence to support that theory.  The jury simply rejected [it] .

. . ." *Williams v. Coyle*, 260 F.3d 684, 705 (6th Cir. 2001).

### (3)      Inaccurate and Incomplete Evidence

Carter argues more specifically that his trial counsel mischaracterized, failed to put into

context, and ignored "compelling" mitigating evidence.  First, he complains that, although Dr.

McPherson testified that Carter was sexually abused, Trial Tr. vol. XVI at 3314, she conceded on

cross-examination that it is possible that Carter himself reported the abuse and may have been

lying, *id.* at 3328–29.  Carter contends that trial counsel were deficient for not bringing to the

attention of the jury records that show that Carter's half-uncle, who was diagnosed with

schizophrenia, was "preoccupied with sexual activities" and "openly masturbates."  ECF No. 89

at 200.  Also, he notes, a social worker wrote in a 1984 letter that she was concerned about

children who lived with him in part because of his inappropriate sexual conduct.  ECF No. 88 at

45–46.  There is no evidence, however, that Carter had any contact with this man, and this

evidence would have had little, if any, mitigating value.

Carter next agues that his educational history was "erroneously characterized."  ECF No.

226 at 23.  Dr. McPherson testified that Carter had "the capacity for normal to slightly below

intellectual function," but that he had a "complete lack or relative lack or indifference to school."

Trial Tr. vol. XVI at 3310.  On cross-examination, she conceded that Carter did well in

elementary school, earning A's and B's.  *Id.* at 3340–41, 3354.  Carter contends that trial counsel

should have offered evidence that Carter was enrolled in a learning disability program during

elementary school, and that his grades deteriorated once he was no longer in such a program.  To

support this argument, Carter cites to an affidavit filed in these federal habeas proceedings,

which the Court may not consider and which does not cite to the record in any event.  ECF No.

226 at 23-24.

       In fact, records introduced at the mitigation phase of Carter's trial do not support Carter's

claim.  The records show that while Carter received special education tutoring in certain subjects

in elementary school, he was placed in a regular classroom.  ECF No. 89 at 33, 34, 40, 156, 168,

170.  The Court also could not find any support in the record for Carter's assertion that he lacked

special education services after elementary school and his grades declined as a result.  There are

no school records past the elementary school level.  Dr. McPherson referenced in her report a

"Psychological Report" from around 1995 that "indicated [Carter] was doing little work in

school, chronic lying and rule-breaking was in evidence."  ECF No. 89 at 9.  She may have been

referring to the 1995 Portage County DYS evaluation, described above, which stated that

Carter's "academic performance in elementary school [was] basically average" but that by ninth

grade "[h]is grades were consistently failing . . . ."  ECF No. 88 at 2.

       Carter next contends that his trial counsel did not offer sufficient evidence regarding his

experience with the Smith family.  He refers to overlooked evidence that the Smiths "emotionally

abused" him by cursing and screaming at him and calling him names; did not understand his

(3:02CV524)                                                                                              70

special needs; spanked him; did not initiate activities with him; and were overly critical of him.

ECF No. 226 at 24.  Carter does not cite to the record to support this claim.

Ms. Dorian and Dr. McPherson testified about many of these problems.  Ms. Dorian

testified about Mrs. Smith's difficulties in understanding Carter's intellectual and social

limitations; her cursing when reprimanding Carter and when frustrated; and her insufficient

interaction with Carter.  Trial Tr. vol. XVI at 3290.  Dr. McPherson testified that the Smiths

"[did] another job on [Carter]"; he "[could not] meet their expectations" and they were

"punitive."  *Id.* at 3322–23.  More evidence on this issue would have been cumulative.  *See Eley*

*v. Bagley*, 604 F.3d 958, 968 (6th Cir. 2010) ("'[T]he failure to present additional mitigating

evidence that is merely cumulative of that already presented does not rise to the level of a

constitutional violation.'") (quoting *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007)).

Carter also complains that his counsel should have presented evidence critical of the

Carters, including that they were financially unstable, could not provide or seek out for him the

psychological services he needed, and had accessible sexually explicit materials in the home.

ECF No. 226 at 25–26.  Instead, he argues, Dr. McPherson conceded on cross-examination that

the Carters were "suitable persons to adopt children" and that they exhibited "heroic behavior" at

their first meeting with Carter.  *Id.* at 25 (quoting Trial Tr. vol. XVI at 3344, 3354).  Trial

counsel, he adds, called the Carters "a fine family" and Mrs. Carter a "nice woman, beautiful

woman" during his closing argument.  *Id.* (quoting Trial Tr. vol. XVI at 3375).

But Dr. McPherson did testify that the Carters did not provide the right environment for

Carter to succeed.  She noted, for example, that the Carters were unprepared for the adoption,

failed to give Carter the support services he needed, and had other children and responsibilities.

Trial Tr. vol. XVI at 3308–09, 3323. She also testified that the Carter home was too sexually

charged for Carter, with several females living there and an unrelated eighteen-year-old male

who shared sexually explicit materials with him. *Id.* at 3309.

Moreover, Dr. McPherson's testimony about the Carters led to damaging rebuttal

evidence and cross-examination, and more details about the family could have caused even more

harm. *See Wong v. Belmontes,* 558 U.S. 15, 25 (2009) (rejecting petitioner's "'more-evidence-is-

better' approach to mitigation" where it would have opened door to evidence of past murders).

For example, the prosecutor vigorously cross-examined Dr. McPherson about her testimony that

the Carter household was not a good environment for Carter. He pointed out the Carters' many

efforts to help Carter and their successes with him, and brought up Carter's sexual misconduct

with his adoptive and birth sisters and other criminal behavior while he lived with them. Trial

Tr. vol. XVI at 3351–58. Finally, it would be reasonable trial strategy to avoid criticizing a

victim's family.

Carter further claims that his counsel failed to "elicit[] any of the positive information

about Sean and his bond with Ms. Magee." ECF No. 226 at 22. He claims they should have had

Ms. Magee testify to "humanize Sean and evoke images of him as a little boy who was trying

hard to please but suffered serious, debilitating setbacks in his young life." *Id.* at 26-27. Carter

refers to an affidavit of Ms. Magee, which was filed in this habeas case and the Court may not

review. However, both Ms. Dorian and Dr. McPherson testified at length about Carter's positive

relationship with Ms. Magee and the strides he made while in her care. *See, e.g.,* Trial Tr. vol.

XVI at 3257, 3271–72, 3275, 3287–89, 3306–08, 3321–23. Ms. Dorian read to the jury from a

social services report that stated, "Lately Mrs. Magee and this worker have observed Sean

(3:02CV524)                                                                                          72

'coming out of his shell.' He can now be described as 'all boy'.  He takes swimming lessons,

plays kickball and baseball.  He loves cars, trucks, drawing and being read to." *Id.* at 3275.  Ms.

Dorian testified that she recommended that Carter remain with Ms. Magee permanently, *id.* at

3287–89, and Dr. McPherson agreed, as noted above, that Ms. Magee was Carter's "only chance"

for a good outcome, *id.* at 3321.  Ms. Magee's testimony, therefore, would have been cumulative.

       In addition, Carter maintains that his trial counsel "failed to present an accurate and

complete picture of his symptoms [of mental illness], their duration and severity, and the link

between his mental illness and the offense." ECF No. 226 at 29.  He claims, for example, that

his counsel did not introduce "any evidence" during mitigation that he "was suffering from a

serious mental illness at the time of the offense" or that he had a genetic predisposition to

schizophrenia. *Id.* at 30, 32.  He relies heavily on the affidavit of an expert and the Linder report

and Darnall letter, as described above.  These documents were produced in these proceedings,

and the Court may not consider them.

       In any event, this claim is flatly contradicted by the record.  As the Court already has

noted, Dr. McPherson testified in detail about Carter's early medical problems, such as his

hearing loss and seizures, *see, e.g., id.* at 3305–07; his delayed cognitive development and

attachment disorder, *see, e.g., id.* at 3305–06; and his psychological functioning and diagnoses,

including his attachment disorder and genetic predisposition to, and possible emergence of,

schizophrenia, *see, e.g., id.* at 3315–21, 3359–60.  Dr. Dorian also testified regarding Carter's

various mental illnesses.  *See, e.g., id.* at 3255–59.  Any more evidence on this issue would have

been cumulative.

Carter further asserts that his counsel introduced evidence of his drug and alcohol abuse "without any regard for explaining or contextualizing this devastating problem, or its interaction with his underlying illness." ECF No. 226 at 43–44.  He concedes, however, that Dr. McPherson "noted" that Carter had abused drugs since age thirteen or fourteen. *Id.* at 43.  And she testified that Carter's substance abuse interfered with her ability to predict whether he was becoming schizophrenic, because the substances can cause the same "lapsed thinking process" that signal the emergence of schizophrenia.  Trial Tr. vol. XVI at 3316.  Moreover, as noted above, Carter's counsel possessed much of the information to which Carter refers.  They may have chosen not to introduce it because it conflicted with his mitigation theme.  As Carter also concedes, Dr. McPherson was forced to admit on cross-examination that it was Carter's choice to "take drugs and inhale various things."  *Id.* at 3335.

Finally, Carter complains that his trial counsel did not present any evidence of the positive impact a structured prison environment could have had on him.  As discussed above, however, defense counsel's decision to present a different mitigation theme than Carter now proposes, and to focus on evidence supportive of that theme and omit other evidence not supportive, is a reasonable trial strategy.

Thus, Carter has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689.  As the Supreme Court has explained,

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained.  It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was

already in hand" fell "well within the range of professionally reasonable judgments."

*Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009) (internal citations omitted).  Accordingly, the Ohio appellate court also reasonably applied *Strickland* in determining that Carter's trial counsel were not constitutionally deficient in their presentation of mitigating evidence.

### 2.        Failing to Object to Prosecutorial Misconduct

For his next sub-claim, Carter argues that his counsel were ineffective for failing to object to the numerous instances of prosecutorial misconduct described in his third ground for relief. ECF No. 226 at 68-70.  Even if this claim were ripe for habeas review, it would fail.  As the Court finds no merit in Carter's underlying claims of prosecutorial misconduct, there is no merit to his claim that his trial counsel was ineffective for failing to object to the challenged conduct. *See infra* Section IV.B.

### 3.        Failing to Present Arguments Regarding Jury Instructions

Carter further argues that his trial counsel performed deficiently by failing to present arguments regarding jury instructions on lesser-included offenses.  ECF No. 129 at 39.  The Ohio Supreme Court was the last state court to provide a reasoned decision on this claim.  It opined:

> Carter's last allegation is that counsel failed to present argument concerning jury instructions on lesser-included offenses. However, counsel did make a request for a lesser-included-offense instruction for all charges and presented argument as to each. There is nothing in the record that would indicate that if counsel had presented additional arguments they would have been successful. As set forth in the discussion of the second proposition of law, even if a lesser-included-offense instruction should have been given on aggravated murder (robbery), the remaining felony of rape still would have supported the aggravated murder count.

*Carter*, 89 Ohio St. 3d at 606, 734 N.E.2d at 357.

The Ohio Supreme Court's decision is reasonable.  Moreover, because the Court finds no merit in Carter's underlying claims regarding these jury instructions, there is no merit to his claim that his trial counsel was ineffective for failing to present the jury instructions at issue.  *See infra* Section V.B.

### 4.        Negating Defense Theory of the Case During Closing Argument

Finally, Carter asserts that his trial counsel were ineffective when they "negated" his principal defense by telling the jury during closing argument that they could find Carter guilty of aggravated murder, aggravated robbery, and rape, even if they had reasonable doubt.  This statement, he argues, undermined their argument for instructions on lesser-included offenses, and "[left] the jury with no choice but to find Carter guilty of the charges in the indictment."  ECF No. 129 at 39; ECF No. 226 at 72 (citing Trial Tr. vol. XVI at 3185–86).  Carter provides no legal authority or factual analysis to support this argument.

Even if this claim were preserved for habeas review, it is meritless.  Carter's trial counsel did not "negate" his defense.  Counsel argued to the jury that it "wouldn't bother [him]" if they found enough evidence to convict Carter on the various independent counts, even if they had "a little reasonable doubt" about those charges based on the evidence presented by the defense, but that there was too much reasonable doubt for them to find against Carter on the death-penalty specifications.  Trial Tr. vol. XV at 3185–86.  Any confusion caused by this brief and isolated argument was not great enough to undermine Carter's entire defense and would have been cured by the court's instructions on the correct burden of proof.

(3:02CV524)                                                                                          76

### III. Sixth Ground for Relief: *Ineffective Assistance of Appellate Counsel*

For his sixth ground for relief, Carter asserts that his appellate counsel provided

ineffective assistance of counsel on direct appeal by failing to raise the following claims:

1.   All instances of prosecutorial misconduct;

2.   All instances of ineffective assistance of trial counsel; and

3.   The trial court's failure to ensure that Carter was competent throughout his trial
     and to protect his right to be present.

ECF No. 129 at 40.

### A.   Procedural Posture

The parties agree that this claim is preserved for federal habeas review, because Carter

raised it in his *Murnahan* petition, which the Ohio Supreme Court summarily denied. ECF No.

138 at 90; ECF No. 226 at 76; *see also* ECF No. 221 at 11 (finding that the Ohio Supreme

Court's summary dismissal of Carter's *Murnahan* petition was presumptively an adjudication on

the merits under). *Harrington*, 562 U.S. at 99–100.

### B.   Merits

The Supreme Court has held that a defendant is entitled to effective assistance of counsel

in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The two-part

test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel.

*Smith v. Robbins*, 528 U.S. 259, 285 (2000). Thus, Carter must demonstrate that his appellate

counsel's performance was inadequate, and that the deficient performance so prejudiced the

appeal that the appellate proceedings were unfair and the result unreliable. *Strickland,* 466 U.S.

at 687.

(3:02CV524)                                                                                      77

An appellant has no constitutional right, however, to have every non-frivolous issue raised on appeal. *See Jones v. Barnes*, 463 U.S. 745, 750–54 (1983). Tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel. *See United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

Here, because the Court finds Carter's claims for prosecutorial misconduct, ineffective assistance of trial counsel, and trial-court error relating to his presence at trial all lack merit, it follows that Carter cannot demonstrate that he was prejudiced by appellate counsel's failure to raise the claims on direct appeal. *See infra* Section IV; *supra* Sections I.B.1.c., II.B.

**IV.   Third Ground for Relief: *Prosecutorial Misconduct***

For his third ground for relief, Carter claims that he was denied a fair trial in violation of his due process rights by acts of prosecutorial misconduct. Specifically, he complains that the prosecution:

1.   Stated personal beliefs about the strength of the State's case and Carter's guilt during closing argument in the following comments:

   a.   "I believe in my side. I believe the evidence that we have that this defendant is guilty of all the charges. I wouldn't be here."

   b.   Characterizing Carter's explanation as to why he went to the victim's house on the night of the murder as "absolutely absurd."

   c.   Vouching for the State pathologist's testimony regarding bleeding in the victim's brain by stating, "I think Dr. Cox's explanation is better than the other doctor's."

(3:02CV524)                                                                                          78

2.      Implied during direct examination of witness Major James Phillips of the
        Trumbull County Sheriff's Department that the trial judge believed Carter
        was guilty because he had signed the search warrants to obtain blood
        samples from Carter.

3.      Used "pervasive" inflammatory language during closing argument,
        including:

        a.      Speaking of the victim's constitutional rights, the "great indignity"
                and "brutality" of the crime, the victim's "unbelievable" death, and
                the victim's pain and suffering.

        b.      Repeatedly reminding the jury that this was done by a grandson to
                his grandmother.

        c.      Arguing that "it's absolutely necessary . . . that people like Sean
                Carter be put out of commission.  His mission of terror, violence,
                is incredible."

        d.      Telling the jury that it was Carter's fault that they had to go
                through nude photographs of the victim and see her stab wounds,
                "blood all over the place," and swabs of her anal cavity.

4.      Argued facts not in evidence during closing argument, including:

        a.      The statement, "you'll see him in the videotape.  'I don't have to
                say I'm sorry.'"

        b.      Referring to Carter as "a machine, a supposed human being."

        c.      Arguing that Michael and Shasta (other young relatives of the
                victim with whom the victim argued) didn't "come back and kill
                and rape grandma."

5.      Mentioned prior calculation and design during rebuttal closing argument,
        when Carter was not charged with that.

ECF No. 129 at 34–36.

A.      **Procedural Posture**

The State argues that sub-claims 1 and 2, as listed above, are procedurally defaulted,

because the Ohio Supreme Court found them barred due to defense counsel's failure to object to

(3:02CV524)                                                                79

the alleged misconduct at trial.  ECF No. 138 at 47–49.  Failure to adhere to Ohio's well-established "contemporaneous objection rule" is an independent and adequate state ground upon which to find habeas claims procedurally defaulted.  *See, e.g., Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).

In response, Carter concedes that the Ohio Supreme Court "announced an intention to apply the plain error doctrine," which ordinarily will not resurrect a defaulted issue.  *See, e.g., id.* However, he argues, the court failed to enforce the rule, and instead addressed the claims under "the general standard of review," rendering the claims ripe for habeas review.  ECF No. 226 at 57-58 (citing *Harris v. Reed,* 489 U.S. 255, 263 (1989); *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986)).  The State did not refute this argument; it "[a]ssum[ed] a lack of procedural default" in its sur-reply.  ECF No. 229 at 13.

The claims are procedurally defaulted.  In addressing these claims, the Ohio Supreme Court first noted that Carter's trial counsel did not object to the alleged misconduct at issue.  As Carter acknowledges, the court then invoked the plain-error rule, quoting *State v. Wade*, 53 Ohio St. 2d 182, 373 N.E.2d 1244, paragraph one of the syllabus (Ohio 1978), *vac'd on other grounds*, *Wade v. Ohio*, 438 U.S. 911 (1978):  "'A claim of error in a criminal case cannot be predicated upon the improper remarks of counsel during his argument at trial, which were not objected to, unless such remarks serve to deny the defendant a fair trial.'"  *Carter*, 89 Ohio St. 3d at 602, 734 N.E.2d at 345.  Indeed, the Ohio Supreme Court repeatedly has cited *Wade* as support for that doctrine.  *See, e.g.*, *State v. McKnight*, 107 Ohio St. 3d 101, 141, 837 N.E.2d 315, 357–58 (Ohio 2005); *State v. Hanna*, 95 Ohio St. 3d 285, 297, 767 N.E.2d 678, 695 (Ohio 2002).  The court proceeded to address the merits of the claims.

In "exceptional circumstances," Ohio courts may examine a claim that is otherwise waived for "plain error," when "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St. 2d 91, 96, 97, 372 N.E.2d 804, 807, 808 (Ohio 1978); *see also* Ohio R. Crim. P. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").  Under this rule, Ohio courts first determine whether there is an error, and then whether that error affected the trial's outcome.  Contrary to Carter's argument, the Ohio Supreme Court did not forgo its plain-error review of Carter's prosecutorial-misconduct claims by examining whether an error was committed under prevailing law; that is exactly what the plain-error doctrine requires.  And, finding no error, there was no need for the state court to undertake the next step in its plain-error analysis.  There is no basis for the Court, therefore, to conclude that the state court did not apply the plain-error rule as it stated it would, and the claims' procedural default stands.

As to Carter's remaining prosecutorial-misconduct sub-claims, the State argues that Carter did not properly raise them in state court, and they are therefore procedurally defaulted.  ECF No. 138 at 48.  Carter counters that the sub-claims were raised in his *Murnahan* petition, and as the Ohio Supreme Court denied the petition without asserting a procedural bar, the claims are not defaulted.  ECF No. 226 at 58.  As explained above, a *Murnahan* petition does not resurrect an otherwise defaulted claim merely by referencing the claim as one that appellate counsel failed to raise on direct appeal.  These claims also are procedurally defaulted.

B.       Merits

Even if this claim were ripe for review, it lacks merit.  The Supreme Court has observed, "Although the State is obliged to 'prosecute with earnestness and vigor,' it 'is as much [its] duty

to refrain from improper methods calculated to produce a wrongful conviction as it is to use

every legitimate means to bring about a just one.'" *Cone v. Bell*, 556 U.S. 449, 469 (2009)

(quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).  In particular, a prosecutor's

"improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to

carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S.

at 88.  Thus, the Court has made clear, "while [the prosecutor] may strike hard blows, he is not at

liberty to strike foul ones." *Id.*

The Supreme Court set forth the standard for claims of prosecutorial misconduct in

habeas proceedings in *Darden v. Wainwright*, 477 U.S. 168 (1986).  It held that to prevail on

such claims, "it 'is not enough that the prosecutors' remarks were undesirable or even universally

condemned.'" *Id.* at 181 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)).

Rather, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v.

DeChristoforo*, 416 U.S. 637, 642 (1974)); *see also United States v. Young*, 470 U.S. 1, 11

(1985) ("Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a

prosecutor's comments standing alone, for the statements or conduct must be viewed in context;

only by so doing can it be determined whether the prosecutor's conduct affected the fairness of

the trial.").

The Court emphasized in *Darden* that "the appropriate standard of review for such a

claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of

supervisory power.'" *Darden,* 477 U.S. at 181 (quoting *Donnelly,* 416 U.S. at 642; *see also Byrd

v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) ("We do not possess supervisory powers over state

court trials."); *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979) ("[I]t is the responsibility of the [state courts] to police their prosecutors; we have no such authority.").  Past decisions of the Supreme Court demonstrate that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The *Darden* standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations . . . .'"  *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (quoting *Yarlborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Indeed, federal habeas courts must adhere to *Darden*'s "highly generalized standard for evaluating claims of prosecutorial misconduct" and not circuit precedent.  *Id.*

In *Darden*, the Supreme Court found that certain comments a prosecutor made during his closing argument "undoubtedly were improper."  *Darden*, 477 U.S. at 180.  Some remarks, it explained, implied that the death penalty would be the only guarantee against a future similar act; others incorporated the defense's use of the word "animal"; and several were offensive, reflecting an emotional reaction to the case.  *Id.*  But the Court concluded that in the broader context of the trial, the prosecutorial statements complained of did not deprive the petitioner of a fair trial.  *Id. at 181–83*.  It noted that the prosecutor's closing argument "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent."  *Id. at 182*.  Also, "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense."  *Id.*  The trial court also instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and the arguments of counsel were not evidence.  *Id.*  The weight of the evidence against the

(3:02CV524)                                                                                    83

petitioner was "heavy," the Court observed, including "overwhelming eyewitness and

circumstantial evidence to support a finding of guilt on all charges," which "reduced the

likelihood that the jury's decision was influenced by argument." *Id.* (internal quotation marks

and citations omitted). And finally, it noted, defense counsel's tactical decision to present the

petitioner as the only witness permitted counsel to give their summation before the State's

closing argument and the chance to make a final rebuttal argument. *Id.*

> As the Supreme Court advised decades ago,
>
> In reviewing criminal cases, it is particularly important for appellate courts to
> relive the whole trial imaginatively and not to extract from episodes in isolation
> abstract questions of evidence and procedure. To turn a criminal trial into a quest
> for error no more promotes the ends of justice than to acquiesce in low standards
> of criminal prosecution.

*Johnson v. United States*, 318 U.S. 189, 202 (1943) (Frankfurter, J., concurring).

Because Carter's prosecutorial-misconduct claims were not adjudicated on the merits in

state court, the Court reviews them *de novo*. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th

Cir. 2005). That is true even when, as with Carter's first two sub-claims, as listed above, the

state court found the claims waived and reviewed them for plain error. The Sixth Circuit has

held that a state court's review of a procedurally barred claim for plain error does not constitute

an "adjudication on the merits" under AEDPA. AEDPA deference does not apply to such

claims, therefore, and federal courts review them *de novo*. *Lundgren v. Mitchell*, 440 F.3d 754,

765 (6th Cir. 2006) ("Plain error analysis is more properly viewed as a court's right to overlook

(3:02CV524)                                                                                              84

procedural defects to prevent manifest injustice, but is not equivalent to a review of the

merits.").[14]

### 1.    Improper Vouching

Carter first complains that the prosecutor impermissibly stated his personal beliefs about

the strength of the State's case and Carter's guilt during closing argument with the following

statement:  "I believe in my side.  I believe the evidence that we have that this defendant is guilty

of all the charges.  I wouldn't be here."  ECF No. 129 at 34 (quoting Trial Tr. vol. XV at 3116).

---

[14]  There appears to be an intra-circuit split on this issue.  Prior to 2009,
the Sixth Circuit followed the holding of *Lundgren, supra*, that AEDPA deference is not
due where a state court reviews a petitioner's habeas claim for plain error.  *See Fleming v.
Metrish*, 556 F.3d 520, 539 (6th Cir. 2009) (Clay, J., concurring in part and dissenting in
part) (providing a "litany of cases" following the "controlling rule in this circuit" that
"[i]n the habeas context, this Court does not construe a state court's plain-error review as
negating the determination that a claim has been procedurally defaulted").  However, in
the 2009 *Fleming* case, *supra*, the Sixth Circuit found "no authority squarely on point on
this key question" and rejected the principle that a "state court's application of plain-error
review *per se* insulate[s] the claim from AEDPA deference."  *Fleming*, 556 F.3d at
531–32.  Rather, it distinguished prior precedent on this point and held that a state court's
plain-error review of a claim "*can* be considered 'adjudicated on the merits' for the
purpose of receiving deference under AEDPA" when the state court first determines the
merits of the claimed error before finding that the error was "plain" and affected
"substantial rights."  *Id.* at 532 (emphasis added).  Then, last year, the Sixth Circuit
reasserted its prior, *per se* rule, declaring, "We have repeatedly held that plain-error
review is not equivalent to adjudication on the merits, which would trigger AEDPA
deference."  *Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014), *reh'g en banc
denied* (Dec. 18, 2014).  The Circuit has since acknowledged this split.  *See id.* at 605-06
(Sutton, J., concurring in part and concurring in the judgment) ("We have been down this
road before, and *Fleming* [, *supra*,] tells us how to navigate it.");  *Wade v. Timmerman-
Cooper*, 785 F.3d 1059, 1079 n.12 (6th Cir. 2015).  When an intra-circuit split such as
this occurs, the earliest decision controls, which in this case would be *Lundgren*.  *See,
e.g., McMellon v. United States*, 387 F.3d 329, 332-33 (4th Cir. 2004) (en banc);  *Hiller v.
Oklahoma,* 327 F.3d 1247, 1251 (10th Cir. 2003);  *Walker v. Mortham*, 158 F.3d 1177,
1188 (11th Cir. 1998);  *see also* Michael Duvall, *Resolving Intra-Circuit Splits in the
Federal Courts of Appeal*, 3 Fed. Cts. L. Rev. 17, 20 (2009).

(3:02CV524)                                                                        85

A prosecutor cannot insert his "personal beliefs into the presentation of his case," because his or

her opinion carries the "imprimatur of the government and may induce the jury to trust the

government's judgment rather than its own view of the evidence." *Young,* 470 U.S. at 8–9.

"[S]uch comments can convey the impression that evidence not presented to the jury, but known

to the prosecutor, supports charges against the defendant . . . ." *Id.* at 18-19. Nevertheless, "'a

state's attorney is free to argue that the jury should arrive at a particular conclusion based upon

the record evidence.'" *Wogenstahl v. Mitchell,* 668 F.3d 307, 331 (6th Cir. 2012) (quoting

*Caldwell v. Russell,* 181 F.3d 731, 737 (6th Cir. 1999)). The statement of which Carter

complains is not improper, as it suggests that the prosecutor's belief is based on the evidence

adduced at trial, not some special outside knowledge of the prosecutor.

Carter next argues that the prosecutor improperly characterized Carter's explanation

about why he went to the victim's house on the night of the murder as "absolutely absurd." ECF

No. 129 at 35 (quoting Trial Tr. vol. XV at 3116). "'[A] prosecutor may assert that a defendant

is lying during her closing argument when emphasizing discrepancies between the evidence and

that defendant's testimony.'" *Wogenstahl,* 668 F.3d at 331 (quoting *United States v. Francis,*

170 F.3d 546, 551 (6th Cir. 1999)). Similarly, the prosecutor here was justified in commenting

on the implausibility of Carter's account of the crime in light of the evidence.

Carter also claims that the prosecutor improperly vouched for the State pathologist's

testimony regarding bleeding in the victim's brain by stating, "I think Dr. Cox's explanation is

better than the other doctor's." ECF No. 129 at 35 (quoting Trial Tr. vol. XV at 3130).

"'Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating

a personal belief in the witness's credibility thereby placing the prestige of the [government]

(3:02CV524)                                                                                      86

behind the witness.'" *Wogenstahl*, 668 F.3d at 328 (quoting *Johnson v. Bell*, 525 F.3d 466, 482

(6th Cir. 2008)).  "'Generally, improper vouching involves either blunt comments or comments

that imply that the prosecutor has special knowledge of facts not in front of the jury or of the

credibility and truthfulness of witnesses and their testimony.'"  *Id.* (quoting *Francis*, 170 F.3d at

550).

      This particular statement is more problematic, because it is a deliberate statement of

personal belief in the witness's credibility and suggests that the prosecutor may have special

knowledge of facts not in evidence, namely, the prosecutor's experience with other expert

witnesses.  Placed in context, however, the statement is not improper.  The prosecutor was

discussing the two parties' experts' testimony and opinions based on the evidence, not the

experts' credentials.  Moreover, the challenged statement was one isolated comment made in the

context of an extensive trial record, and the evidence against Carter was strong.

### 2. Implying Trial Court Believed in Carter's Guilt

      Carter claims that the prosecutor improperly implied that the trial-court judge believed

Carter was guilty during his direct examination of witness Major James Phillips of the Trumbull

County Sheriff's Department, because the judge had signed the search warrants to obtain blood

samples from Carter.  ECF No. 129 at 35 (quoting Trial Tr. vol. XII at 2340).  The prosecutor's

examination at issue consisted of two short questions, establishing first that the police officer

signed an affidavit supporting his request for a search warrant before the trial judge, and second

that the judge issued the warrant.  Carter speculates that the jury inferred from this testimony that

the judge issued the warrant because he believed Carter was guilty, when, in fact, the testimony

(3:02CV524)                                                                                    87

was limited to explaining the facts surrounding the issuance of a warrant for the collection of

Carter's fluids, which were central to the State's case.  This questioning was not improper.

### 3.       Pervasive Use of Inflammatory Language

Carter accuses the prosecution of "pervasive" use of inflammatory language during

closing argument, including:  (1) speaking of the victim's constitutional rights, the "great

indignity" and "brutality" of the crime, her "unbelievable" death, and the victim's pain and

suffering; (2) repeatedly reminding the jury that a grandson had killed his grandmother; (3)

arguing that "it's absolutely necessary . . . that people like Sean Carter be put out of commission.

His mission of terror, violence, is incredible"; (4) telling the jury they had to go through nude

photographs of the victim and look at stab wounds, "blood all over the place," and swabs of the

victim's anal cavity because of Carter.  ECF No. 129 at 35 (quoting Trial Tr. vol. XV at 3111,

3115).

"The prosecution necessarily has 'wide latitude' during closing argument to respond to

the defense's strategies, evidence and arguments."  *Wogenstahl,* 668 F.3d at 329 (quoting

*Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)).  "Generally, 'a prosecutor cannot make

statements calculated to incite the passions and prejudices of the jurors.'"  *Id.* (quoting *Broom v.*

*Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006)).  "At the same time, '[n]othing prevents the

government from appealing to the jurors' sense of justice or from connecting the point to the

victims of the case.'"  *Id.* (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)).  These

statements were within the bounds of dramatic, though permissible, argument.  Moreover, all of

the complained-of statements are found on just two of twenty-five pages of transcript recording

(3:02CV524)                                                                                               88

the prosecutor's closing argument.  They were brief and general, and several of the statements

were factually correct.

### 4.    Arguing Facts not in Evidence

Carter also complains that the prosecution argued facts not in evidence during closing

argument, including:  (1) stating, "you'll see him in the videotape.  'I don't have to say I'm

sorry.'"; (2) referring to Carter as "a machine, a supposed human being."; (3) arguing Michael

and Shasta didn't "come back and kill and rape grandma."  ECF No. 129 at 36 (quoting Trial Tr.

vol. XV at 3118, 3120).

"It is improper for a prosecutor, during closing arguments, to bring to the attention of the

jury any 'purported facts that are not in evidence and are prejudicial.'"  *Byrd v. Collins*, 209 F.3d

486, 535 (6th Cir. 2000) (quoting *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995)).

"However, prosecutors 'must be given leeway to argue reasonable inferences from the

evidence.'"  *Id.* (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)).  These

statements were not improper.  The first was the prosecutor's interpretation of Carter's statement

to police, not a deliberate attempt to mislead the jury into thinking Carter actually so stated, and

the prosecutor repeatedly encouraged the jury to listen to the tapes for themselves.  *See, e.g.*,

Trial Tr. vol. XV at 3118.  The second comment was more hyperbole than factual assertion.  And

the third comment did not introduce new facts.  Evely Carter testified that her mother told her

that she was going to treat Carter "just like I do Shasta [and] Michael" by not allowing him to

return to her house, and explained on cross-examination that they were her niece and nephew.

Trial Tr. vol. XII at 2547, 2567.

(3:02CV524)                                                                                    89

### 5.    Mentioning Prior Calculation and Design

Finally, Carter complains that during rebuttal closing argument, the prosecutor improperly mentioned an element of a crime, prior calculation and design, with which Carter was not charged.  ECF No. 129 at 36 (citing Trial Tr. vol. XV at 3201).  This statement is harmless in context.  The prosecutor stated after the challenged comment, "He's not charged with that.  Sorry.  I got carried away again."  Trial Tr. vol. XV at 3201.

### 6.    Cumulative Effect

Carter asserts that the cumulative effect of these acts of misconduct rendered his trial unfair.  The "cumulative effect" of multiple acts of misconduct may be considered.  *See Berger, 295 U.S. at 89*.  However, determinations as to the impropriety or effect of a prosecutor's conduct at trial should account for the broader context in which the prosecutor's conduct took place.  *Darden, 477 U.S. at 182*; *Young, 470 U.S. at 12*.

Viewing all of Carter's allegations of prosecutorial misconduct cumulatively and in the context of the entire trial, Carter's claims do not entitle him to habeas relief.  There are few instances of improper conduct among these claims, and even if they and those that verged on improper were viewed cumulatively, Carter has failed to demonstrate that the misconduct was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial."  *See Wogenstahl, 668 F.3d at 335*.  As the Supreme Court has noted, "[a litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials."  *McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 553 (1984)* (internal quotation marks and citations omitted).

(3:02CV524)                                                                      90

## V.  Fourth Ground for Relief:  *Trial-Court Error / Jury Instructions*

Carter claims for his fourth ground for relief that the trial court violated his right to due process by denying his request to instruct the jury on certain lesser-included offenses.  ECF No. 129 at 36–37.  He argues that the court should have instructed the jury on theft, in addition to aggravated robbery, because, although he admitted that he took some money from Mrs. Prince's purse, he did so only after the murder took place, and therefore did not use a deadly weapon or inflict serious physical harm while committing the act, as required for aggravated robbery under Ohio law.  ECF No. 226 at 63–64.  He contends that the court should have instructed the jury on gross sexual imposition, in addition to rape, because the defense presented evidence that the "lack of trauma to the rectum made it equally as plausible that the semen . . . could have been deposited outside the body and seeped into the rectum."  *Id.* at 64.  Finally, Carter asserts that the court should have instructed the jury on murder, in addition to aggravated murder, because the jury may have found that he did not commit the murder "while committing or attempting to commit" another felony, as required for aggravated murder under Ohio law; and manslaughter, because the jury may have believed that "Mrs. Prince argued with and eventually pushed Carter."  *Id.* at 65.  Failure to give these instructions, he concludes, impermissibly resulted in the jury being "'forced into an all-or-nothing choice between capital murder and innocence.'"  *Id.* at 66-67 (quoting *Spaziano v. Florida*, 468 U.S. 447, 455 (1984)).

### A.  Procedural Posture

Carter raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated the claim on the merits.  *See Carter*, 89 Ohio St. 3d at 599-602, 734 N.E.2d at 352–54.  This claim is therefore preserved for federal habeas review.

(3:02CV524)                                                              91

### B.    Merits

In considering this claim, the Ohio Supreme Court opined,

In his second proposition of law, Carter argues that the trial court erred by failing to give the jury lesser-included-offense instructions on aggravated murder (murder and manslaughter requested), aggravated robbery (theft requested), and rape (gross sexual imposition requested). The trial court denied these requests.FN1 In *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus, this court set out the test used to determine whether one offense constitutes a lesser-included-offense of another:

FN1. The trial court did grant the defense request to instruct on criminal trespass as a lesser-included-offense for aggravated burglary, and the jury did find Carter guilty of the lesser offense.

"An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense."

An instruction on a lesser-included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense. . . .

**Aggravated Robbery.** Carter argues that the jury should have received a lesser-included-offense instruction because he did not take money until after Prince was dead.FN2 Carter argues that he did not form the intent to take the money until after his grandmother was dead, and even then, only when he realized that he needed money. Carter supports his reasoning by noting that he took only one hundred and fifty dollars from Prince's purse, even though the purse contained approximately four hundred and fifty dollars.

FN2. Carter did not raise any issue relating to the sufficiency or weight of the evidence concerning the aggravated robbery count.

Carter was indicted for aggravated robbery under R.C. 2911.01(A)(1) and 2911.01(A)(3). Those sections provide as follows:

"(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

"(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

" * * *

"(3) Inflict, or attempt to inflict, serious physical harm on another."

A "theft offense" is defined in R.C. 2913.02 as follows:

"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

"(1) Without the consent of the owner or person authorized to give consent;

"(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

"(3) By deception;

"(4) By threat;

"(5) By intimidation."

Theft carries a lesser penalty than aggravated robbery. Further, one element of aggravated robbery, R.C. 2911.01(A)(1), having a deadly weapon on or about the accused's person or under his or her control, is not required to prove theft. Thus, the first and third elements of the Deem test are clearly satisfied.

The issue becomes whether aggravated robbery, as statutorily defined above, can ever be committed without theft, as statutorily defined above, also being committed. We answer that question in the affirmative because aggravated robbery can be committed in the course of an "attempted theft." R.C. 2913.02; 2923.02. Theft requires the accused to actually obtain or exert control over the property or services of another; attempted theft does not. Since theft is not a lesser-included offense of aggravated robbery, the trial court did not err by not providing a lesser-including-offense instruction.

**Rape.** Carter argues that there was no "sexual conduct," i.e., penetration, to the anus of the victim. Instead, Carter presented a theory at trial that the semen was deposited on the outside of the body and seeped into the anus. The evidence in the record strongly supported the state's theory that Carter's sperm, found in the

victim's anus and positively identified through DNA testing, was placed there through the insertion of Carter's penis into the victim's anus. The evidence did not support an acquittal on the charge of rape.

**Aggravated Murder.** The distinguishing element of aggravated murder and murder is the commission of a murder during a felony. The felonies charged were rape and aggravated robbery. Here the evidence clearly supported the commission of a rape; therefore, the trial court properly denied a lesser-included-offense instruction on murder. . . .

Carter also argues that the theft of money from the victim did not occur "while" the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit the aggravated murder. Appellant suggests that implicit in the meaning of the word "while," as it appears in R.C. 2929.04(A)(7), is a requirement that there be evidence of some type of motivational nexus between the aggravated murder and the underlying felony, in this case the aggravated robbery.

This court has previously held that the robbery need not take place prior to or simultaneously with the murder and that a defendant "cannot escape the effect of the felony-murder rule by claiming that the aggravated robbery was simply an afterthought." . . . Accordingly, it was not error to fail to instruct on the lesser-included offense of murder, as it related to the aggravated robbery offense.

Carter's second proposition of law is overruled.

*Carter*, 89 Ohio St. 3d at 599–602, 734 N.E.2d at 352–54 (citations omitted).

Carter claims that this decision contravened or unreasonably applied clearly established

Supreme Court precedent. ECF No. 226 at 66. The Court disagrees.

The Supreme Court held in *Beck v. Alabama*, 447 U.S. 625, 627 (1980), that the death

penalty may not be imposed where the jury was "not permitted to consider a verdict of guilt of a

lesser included non-capital offense, and [where] the evidence would have supported such a

verdict," leaving the jury with the stark choice of convicting the defendant and sentencing him to

death because a serious crime had been committed or finding him not guilty at all because the

crime does not warrant death. The Court explained, however, that the constitutional right to a

jury instruction on a lesser-included offense arises only if "the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater." *Id.* at 635 (internal quotation marks and citations omitted).  This is so because "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting of a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637.

Carter claims that the Ohio Supreme Court unreasonably applied *Beck* "[b]y focusing on the sufficiency of the evidence supporting the capital charge, [and thereby] in effect convert[ing] Carter's *Beck* claim into a challenge to the sufficiency of the evidence under *Jackson v. Virgina,* 443 U.S. 307 (1979)." ECF No. 226 at 66.  However, in *Hopper v. Evans,* 456 U.S. 605, 613 (1982), the Supreme Court made it clear that *Beck* held that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Id.* at 611 (emphasis original).  And the Court found in that case that the evidence not only supported the claim that the defendant intended to kill the victim, but his testimony and evidence that he shot the victim in the back during an armed robbery "affirmatively negated any claim that he did not intend to kill the victim." *Id*. at 613.

Thus, "[i]t is well established that a lesser-included-offense instruction is not required where the facts of a murder so strongly indicate intent to kill that the jury could not rationally have a reasonable doubt as to the defendant's intent." *Smith v. Bradshaw,* 591 F.3d 517, 524 (6th Cir. 2010).  Indeed, "as a general matter, repeated violent conduct conclusively proves intent to kill." *Id.*; *see also Slaughter v. Parker,* 450 F.3d 224, 236–38 (6th Cir. 2006) (rejecting *Beck*

(3:02CV524)                                                                                                 95

claim since the "facts [that the victim was bludgeoned in the head and stabbed five times]

foreclose the conclusion that [the defendant] acted with any mental state other than intent");

*Abdus-Samad v. Bell,* 420 F.3d 614, 629 (6th Cir. 2005) (rejecting *Beck* claim because "[t]he fact

that [the defendant] shot the victim with a pistol five to six times makes it virtually impossible to

find that the killing was accidental"); *Campbell v. Coyle*, 260 F.3d 531, 543–44 (6th Cir. 2001)

(rejecting *Beck* claim because the number and location of the victim's five stab wounds

"compelled a reasonable jury to find that the [defendant] possessed the intent to kill," despite

evidence of a struggle).

      Here, the Ohio Supreme Court reasonably applied *Beck* and its progeny by focusing on

the evidence presented at Carter's trial, and considering whether it supported the greater charges

of aggravated murder, aggravated robbery and rape, and negated the possibility of the lesser

charges of murder, manslaughter, theft and gross sexual imposition, making the lesser-included

instructions unnecessary.  The state court reasonably found that the jury could not rationally have

had a reasonable doubt that Carter committed aggravated robbery, and was guilty only of theft,

because Carter stole the victim's money after he murdered her.  Nor could the jury have had a

reasonable doubt that the prosecution had proven each element of rape, despite Carter's argument

that his semen "seeped" into the victim without any penetration.  And finally, due to the severity

and location of the victim's wounds, the jury could not rationally have had a reasonable doubt

regarding Carter's intent to kill her, negating the need for the lesser-included murder and

manslaughter instructions.

## VI.    Seventh Ground for Relief:  *Method of Execution / Lethal Injection*

Carter argues for his seventh ground for relief that Ohio's method of execution by lethal injection violates the Eighth Amendment prohibition on cruel and unusual punishment and the Due Process Clause of the Fourteenth Amendment.  ECF No. 129 at 41–43.

### A.    Procedural Posture

Carter raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated the claim on the merits.  *See Carter*, 89 Ohio St. 3d at 608, 734 N.E.2d at 358.  This claim is therefore ripe for federal habeas review.

### B.    Merits

In addressing this claim, the Ohio Supreme Court stated,

> In his thirteenth proposition of law, Carter argues that the death penalty is unconstitutional under the federal and Ohio Constitutions because the methods used to carry out the sentence, electrocution or lethal injection, are cruel and unusual punishment. While Carter argues that electrocution is cruel, this court and the United States Supreme Court have previously held that execution by electrocution does not violate the federal and Ohio constitutions.  *In re Kemmler* (1890), 136 U.S. 436, 443–444, 10 S.Ct. 930, 932, 34 L.Ed. 519, 522–523; *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633. The United States Supreme Court granted certiorari this term to a case that involved the issue of whether execution by electrocution violates the Cruel and Unusual Punishment Clause.  *Bryan v. Moore* (1999), 528 U.S. 960, 120 S.Ct. 394, 145 L.Ed.2d 306. The court subsequently dismissed Bryan as improvidently granted after the Governor of Florida signed into law a bill allowing lethal injection as an option to the electric chair.  *Bryan v. Moore*, 528 U.S. 1133, 120 S.Ct. 1003, 145 L.Ed.2d 927. Carter fails to cite any case in which lethal injection has been found to be cruel or unusual punishment. This proposition of law is overruled.

*Carter*, 89 Ohio St. 3d at 608, 734 N.E.2d at 358.

Carter's assertion that the Ohio Supreme Court's rejection of his lethal-injection method-of-execution claim was contrary to, or an unreasonable application of, Supreme Court precedent must be examined in the context of Supreme Court jurisprudence at the time that the state court

rendered its decision. *See Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003) ("In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."). In 2000, when the Ohio Supreme issued its ruling in Carter, there was no Supreme Court precedent holding that lethal injection constitutes cruel and unusual punishment. The High Court did not even review a challenge to lethal injection until 2008, when it decided *Baze v. Rees,* 553 U.S. 35 (2008). Indeed, "[w]hile methods of execution have changed over the years, '[the Supreme] Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment.'" *Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2014) (quoting *Baze*, 553 U.S. at 48). Carter's claim, therefore, is meritless.

**VII.    Eighth Ground for Relief:  *Mental Illness***

For his eighth ground for relief, Carter contends that due to his serious mental illness, from which he suffered at the time of his offense and continues to suffer to this day, his execution would violate the Eighth Amendment's prohibition on cruel and unusual punishment. He cites *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), in which the Supreme Court held that, in light of "our evolving standards of decency," executing an intellectually disabled offender violates the Eighth Amendment's ban on cruel and unusual punishment, and *Roper v. Simmons*, 543 U.S. 551, 568 (2005), which similarly prohibits the execution of juvenile offenders. ECF No. 226 at 80-84.

**A.    Procedural Posture**

The State argues that this claim is procedurally defaulted because Carter never raised it in state court. ECF No. 138 at 96. Carter does not address the procedural posture of this claim.

The State is correct; this claim is procedurally defaulted.  *See O'Sullivan,* 526 U.S. at 848 (if a

petitioner fails to fairly present any federal habeas claims to the state courts and has no remaining

state remedies, then the petitioner has procedurally defaulted those claims); *Jacobs v. Mohr,* 265

F.3d 407, 417 (6th Cir. 2001) (Ohio's doctrine of *res judicata,* barring courts from considering

any issue that could have been, but was not, raised on direct appeal, is an "independent and

adequate state ground" upon which to find habeas claim procedurally defaulted).

### B.   Merits

Carter's claim appears to be what has been called a "free-standing actual innocence"

claim, although Carter does not label it as such.  In *Herrera v. Collins*, 506 U.S. 390 (1993), the

Supreme Court explained that "a claim of 'actual innocence' is not itself a constitutional claim,

but instead a gateway through which a habeas petitioner must pass to have his otherwise barred

constitutional claim considered on the merits."  *Id.* at 404.  The Court stated in dicta, however,

that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial

would render the execution of a defendant unconstitutional" regardless of whether any

constitutional violation occurred during trial.  *Id.* at 417.  "Actual innocence" encompasses not

just innocence of the underlying offense, but also the petitioner's eligibility for the death penalty.

*See, e.g., Dretke v. Haley*, 541 U.S. 386, 387 (2004) (citing *Sawyer v. Whitley*, 505 U.S. 333

(1992)).

The Supreme Court has never applied such a claim, however, and recently declined to

resolve whether a "free-standing" actual innocence claim is cognizable on federal habeas review.

*McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).  The Sixth Circuit has held that such a

claim is not a valid ground for habeas relief.  *See, e.g., Cress v. Palmer*, 484 F.3d 844, 854–55

(6th Cir. 2007); *Thomas v. Perry*, 553 F. App'x 485, 487 (6th Cir. 2014).  Moreover, the *Herrera*

Court emphasized that "the threshold showing for such an assumed right would necessarily be

extraordinarily high." *Herrera,* 506 U.S. at 417; *see also* *House v. Bell*, 547 U.S. 518, 520

(2006).

Because this claim has not yet been recognized by the Supreme Court or the Sixth

Circuit, relief on this claim is denied.

**VIII.  Ninth Ground for Relief:  *Ford Claim***

Carter claims in his ninth ground for relief that his execution will violate the Eighth and

Fourteenth Amendments under *Ford v. Wainwright*, 477 U.S. 399 (1986), because he is

"currently severely mentally ill" and "too insane and incompetent to be executed." ECF No. 129

at 48.  Carter withdrew this claim in his traverse, however, because it is premature under *Panetti*

*v. Quarterman,* 551 U.S. 930, 947 (2007), which holds that an Eighth Amendment *Ford* claim

based on a petitioner's incompetency to be executed due to mental illness does not become ripe

until the petitioner's execution date is set.  ECF No. 226 at 85.

CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA")

for any of Carter's grounds for relief.  The Sixth Circuit has determined that neither a blanket

grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital

habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which

ideally should separate the constitutional claims that merit the close attention of counsel and this

court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487

(3:02CV524)                                                                                          100

(6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for

certificate of appealability for district court's analysis of claims).

      Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. §

2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may
> not be taken to the court of appeals from --
>
> > (A) the final order in a habeas corpus proceeding in which the detention
> > complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the applicant has
> made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA

statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole

difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate

he was denied a *constitutional*, rather than federal, right.  *Slack v. McDaniel*, 529 U.S. 473, 483–

84 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA

versions of that statute).

      Furthermore, if a habeas claim is not procedurally defaulted, then the court need only

determine whether reasonable jurists would find the district court's decision "debatable or

wrong."  *Id.* at 484.  A more complicated analysis is required, however, when assessing whether

to grant a COA for a claim the district court has determined is procedurally defaulted.  In those

instances, a COA should only issue if "jurists of reason would find it debatable whether the

petition states a valid claim of the denial of a constitutional right and that jurists of reason would

find it debatable whether the district court was correct in its procedural ruling."  *Id.*

      After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for the Fourth, Fifth (as to sub-claim relating to failure to present argument about jury instructions), Sixth, and Seventh grounds for relief, finding that no reasonable jurist would debate the Court's conclusions on these claims.

Also, the Court will not issue a COA for the Third, Fifth (as to sub-claims relating to failure to object to prosecutorial misconduct and negating theory of the case); and Eighth grounds for relief, because they are procedurally defaulted.[15]

The Court will issue a COA for Carter's First ground for relief regarding his competency to stand trial, Second ground for relief relating to his trial counsel's ineffective assistance during the mitigation phase of trial, and Fifth ground for relief relating to his trial counsel's ineffective assistance regarding his competency to stand trial, finding that a reasonable jurist could debate the Court's conclusions regarding these claims.

## CONCLUSION

For the foregoing reasons, the Court denies Carter's Petition for Writ of Habeas Corpus. The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to Carter's First ground for relief regarding his competency to stand trial, Second ground for relief relating to his trial counsel's ineffective assistance during the mitigation phase of trial, and Fifth ground for relief relating to his trial counsel's ineffective assistance regarding his competency to stand trial.  The Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those

---

[15]  As stated above, Carter withdrew his Ninth ground for relief.   ECF No. 226 at 85.

(3:02CV524)                                                                                              102

claims only.  As to all remaining claims, the Court certifies that, pursuant to 28 U.S.C. §

1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no

basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P.

22(b).


       IT IS SO ORDERED.


 September 30, 2015                                 /s/ Benita Y. Pearson
Date                                                            Benita Y. Pearson
                                                                United States District Judge